DANFORTH and others, Appellants, vs. CITY OF OSHKOSH and others, Respondents.

*May 12—October 20, 1903.*

*Perpetuities: Charitable uses: Gross term: Personalty: Trustees: Power to sell: Devise or grant of land for public library: Validity: Title.*

1. Our statutes against perpetuities (secs. 2038, 2039, Stats. 1898) are applicable to grants and devises for charitable purposes. MARSHALL and SIEBECKER, JJ., dissent.
2. Sec. 2039, Stats. 1898, permits suspension of the absolute power of alienation for a gross term not exceeding twenty-one years.
3. Neither the statute nor the common law in this state prohibits perpetuities in personalty.
4. The absolute power of alienation is not suspended, within the purview of the statute, when a trustee or other donee of the legal title is given authority to sell and convey complete title.
5. Where, pursuant to a devise to trustees, land was conveyed by them to a city absolutely, to be used by it perpetually as a site for a public library, subject to a provision that if the land should cease to be so used it should revert to the heirs of the testatrix and the heirs of her deceased husband, there was no violation of the statutes against perpetuities:

   (a) The use to which the land was to be devoted being a corporate one, both the legal title and the beneficial or equitable right was held by the city in its corporate capacity; hence no trust was created or imposed upon the city, and it took the title in fee.

   (b) If the restraints upon the use or disposal of the property were limitations only, they were so repugnant to the grant as to be void.

   (c) If a condition subsequent was imposed thereby, so that on breach thereof the fee would determine, the future estate

in possession dependent upon such condition was so vested in the heirs named that the absolute power of alienation was not meanwhile suspended.

MARSHALL and SIEBECKER, JJ., are further of the opinion that if the statutes against perpetuities are applicable to conveyances for charitable purposes, the express legislative authority to the city to maintain a public library and to take title to land for that purpose was a repeal pro tanto of such statutes or created an exception thereto.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. Affirmed.

Appeal from judgment of the circuit court affirming the final order of distribution entered by the county court in the matter of the will of Abby S. Harris. By that will, executed in 1891, the testatrix, after various personal donations to her kindred and the kindred of her deceased husband and for other purposes, by the fourteenth paragraph of the will gave and devised all the residue, real, personal, and mixed, to Gabriel Bouck, Orville Beach, and Mary A. Olcott, to hold in trust for certain defined uses and purposes, namely, in founding, preparing, conducting, and maintaining perpetually a public library, with all the appurtenances and all things thereto pertaining, and the necessary library buildings and premises,

"to be so constructed and maintained as aforesaid upon my homestead lots in said city and on the northeast corner of Washington street and Jefferson avenue, to wit [description], if owned by me at the time of my decease."

This grant is made

"upon the express condition that within three years after my decease the said city of Oshkosh, the citizens thereof, or other persons or parties, or any, either, or all thereof, within three years from my decease, shall raise, grant, give, and donate to the said city of Oshkosh for the same purpose an amount equal to the value of my property hereby so donated. . . . When said equal amount shall be so raised and donated as aforesaid, . . . then the property so hereby given

[etc.] to my said trustees for the purposes aforesaid, or the proceeds thereof and the net income therefrom, shall be transferred, conveyed, assigned, and set over absolutely by my said trustees, by necessary and proper instruments of conveyance and transfer, to the said city of *Oshkosh* . . . or any lawful trustees by it lawfully selected, and upon the absolute donation and transfer to said city of *Oshkosh* or trustees aforesaid of the aforesaid equal amount and the same to be approved by my said trustees, the whole thereof, except so much of the principal as may be used for the purposes aforesaid, and the net income thereon, to be a perpetual fund, to be used and enjoyed by said city of *Oshkosh* or trustees as aforesaid, perpetually, for the purchase, providing, obtaining, supplying and maintaining a library building and premises, and public library . . . upon my lots and premises now owned by me on the corner of Jefferson avenue and Washington street [same description as before], if owned by me at the time of my decease, then said library building shall be perpetually maintained thereon and such public library maintained therein. If the whole of said fund and net income thereon shall not be wholly used and enjoyed and appropriated for the uses and purposes aforesaid, then the property hereby given, granted, bequeathed, devised and donated, or the proceeds thereof or the income thereon (except the income that may have been lawfully used and enjoyed and appropriated for the purposes aforesaid), shall revert to my lawful heirs and to the lawful heirs of my deceased husband, Marshall Harris, one half to my heirs and one half to my said husband's heirs. My said trustees, until the expiration of said three years after my decease, or until said equal amount shall be raised, given, and donated as aforesaid, may sell, convey, transfer, assign, set over absolutely, or rent any property, real or personal, hereby given [etc.] and invest the same, or the proceeds thereof, as they may deem advisable and for the best interests of such fund, but not to rent beyond three years from my decease. [Power to execute necessary conveyances.] Provided however that the instrument of transfer and conveyance of my said lots and homestead premises on the corner of said Washington street and Jefferson avenue shall contain a limitation to the title or interest conveyed that same shall cease and end and revert to my heirs

and the heirs of Marshall Harris, deceased, my husband as aforesaid, when the same shall no longer be used and enjoyed for such library purposes as herein provided."

Provision was then made for supplying vacancies among the trustees.

"The said city of *Oshkosh* shall be responsible for the faithful execution by said trustees of the property, proceeds, fund, and income hereby donated or executed, and may, if deemed advisable, execute and carry the same out by trustees lawfully selected, but the city of *Oshkosh* shall be responsible for the acts of said trustees.

"Before my said trustees shall so transfer said property, proceeds, and income as aforesaid, the said city of *Oshkosh,* by resolution or ordinance of its common council, by a vote of two thirds of the members, shall accept and agree faithfully to carry out and execute the condition hereof and of said trust."

Prior to June 21, 1898, the executor, having paid all the specified legacies, made his final account, with prayer for final assignment, distribution, and discharge of the executor, and the county court on that date made its order allowing his account, and ordering the residue paid over to *Bouck et al.,* as trustees, in trust for the purposes and uses specified in paragraph 14 of the will. The amount was ascertained by appraisal to be $75,734.33. Thereupon, on the 23d day of June, 1898, the city of *Oshkosh* paid over to said trustees an exactly equal amount of money, raised by said city, to be devoted to the purposes of the library; whereupon the said trustees, on the same day, paid and transferred all said property, real and personal, to the city of *Oshkosh.* Prior to such payment, the city, by its common council, duly accepted the donation, agreed to raise and did raise an equal amount, and agreed that the same should be held by the said city of *Oshkosh* for the erection of a public library building and the maintaining of a public library, as provided by said will, and that no part thereof should be used for any other purpose,

and that the amount should be kept separate from all other funds of the said city. The city also, by a special election held in May, 1895, decided, in compliance with sec. 931, R. S. 1878, to establish a library and levy tax therefor.

It is also found as a fact that prior to trial and judgment in circuit court the city had erected a public library building upon the homestead premises, and then was maintaining a public library therein, and had performed all the conditions of said gift on its part. In August, 1898, the heirs at law of the testatrix and of her deceased husband, Marshall Harris, appealed from the final order of the county court, and especially from that part which assigned the residue of the estate to the trustees named for library purposes. On trial in circuit court the order of the county court was affirmed by judgment entered April 1, 1902, from which judgment all of said appellants in the court below bring this appeal.

For the appellants there was a brief by *Barber Brothers,* attorneys, and *Jones & Stevens,* of counsel; a separate brief by *John M. Olin,* of counsel; and oral argument by *Mr. B. W. Jones* and *Mr. Olin.*

*Charles Barber* and *Gabe Bouck,* of counsel, for the respondent *City of Oshkosh.*

DODGE, J. The testatrix, Abby S. Harris, by her will, now before us, has earned the right that her name be writ large among those who loved their fellowmen, and has sought to give her charity practical efficacy in a most wise and admirable field and generous form. Much as we must admire such efforts to promote the welfare of her fellows, we are nevertheless burdened with the duty of testing the scheme adopted by the testatrix by the rules and limitations which the legislature has deemed wise to impose for the protection of the welfare of the community in other directions.

The appellants contend that the scheme involves such suspension of the power of alienation as is forbidden by sec.

2039, Stats. 1898, and, by sec. 2038, Id., renders void the estate attempted to be conferred upon the city of *Oshkosh.* Further, they contend that, even if such forbidden perpetuity is created only as to the homestead, yet that is sufficient to defeat the title to all the property, because the use of the rest is only authorized for the erection and maintenance of a library upon the homestead premises as a site. To escape this objection and sustain the devise, we are strongly pressed to hold that our statute against perpetuities has no application to grants for charitable purposes. This subject would at first glance appear to have been set at rest by the decisions in *De Wolf v. Lawson,* 61 Wis. 469, 21 N. W. 615, and *Beurhaus v. Cole,* 94 Wis. 617, 69 N. W. 986, made by consensus of all members of the court, wherein it was held that a grant of realty for charitable uses was void because it suspended the power of alienation to the extent prohibited by sec. 2039, Stats. 1898. Counsel, however, urge that expressions found in the opinion in *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345, invite the profession to believe that the question is considered still an open one. Whether that language, used as it was without mention of the *Cole Case*—indeed, in apparent oversight of the decision of the question in both the former cases—could have been intended to suggest a doubt as to their authority, we must confess that upon careful inspection it may warrant some measure of uncertainty among the profession upon this very important subject. This leads us to the view that, although affirmance of the judgment might result upon other grounds, we ought to remove any uncertainty arising from the cited remarks in the *Harrington Case,* and declare the view of the court, since the question is squarely presented and argued with much vigor and learning. Of course, what was said in that case had no relation to anything in fact decided, did not in any wise lead to nor support the conclusion reached by the court. It therefore cannot be given the weight of authoritative precedent, or war-

rant hesitation in following the settled rule of decision, if we find such exists.

The question is one purely of statutory construction. However fully members of this court may believe in a policy which would permit perpetuities in charitable grants, we should transcend our rightful powers should we attempt to establish or enforce such a policy in defiance of legislative declaration of a different one. We may therefore dismiss from present consideration those decisions of courts elsewhere, acting under different statutory conditions, in support of either a liberal or a restrictive policy. Our original statute on the subject (secs. 14, 15, ch. 56, R. S. 1849) was taken *in hæc verba* from New York, and declared:

"Sec. 14. Every future estate shall be void in its creation, which shall suspend the absolute power of alienation for a longer period than is prescribed in this chapter; such power of alienation is suspended, when there are no persons in being, by whom an absolute fee in possession can be conveyed.

"Sec. 15. The absolute power of alienation shall not be suspended, by any limitation or condition whatever, for a longer period than during the continuance of two lives in being at the creation of the estate, except in the single case mentioned in the next section."

In this there is no express exception of grants to charitable uses. The words are general, and only in defiance of their literal force could any such exception be allowed. At the time they were adopted from New York, no court of last resort had placed any qualification upon their literal meaning. True, an assistant vice chancellor (SANDFORD) had expressed an opinion that charities were intended to be excepted (*Shotwell v. Mott,* 2 Sandf. Ch. 46), but he, of course, spoke without final authority, subject to review by higher courts. The literal efficacy of this statute apparently was neither questioned nor affirmed in Wisconsin until *Ruth v. Oberbrunner,* 40 Wis. 238, in 1876, in which it was decided that the cognate

statute, sec. 1, ch. 57, R. S. 1849 (now sec. 2071, Stats. 1898), by general language abolishing uses and trusts, was subject to no exception in favor of trusts for charities, and in which it was further said, apropos of an objection that the statute against perpetuities also rendered invalid the devise there under consideration, "We do not see how the objection is to be overcome, but will not express an opinion upon it." Meanwhile the courts of New York had been wavering over the construction of the same statute there. The court of last resort, having once only, and that with serious division, declared itself in favor of exemption of charities (*Williams v. Williams,* 8 N. Y. 525), had, after several expressions of doubt and disapproval of that case, settled definitely to the contrary view, and overruled *Shotwell v. Mott, supra,* and *Williams v. Williams, supra,* thereon. *Leonard v. Burr,* 18 N. Y. 96, 107; *Levy v. Levy,* 33 N. Y. 97; *Bascom v. Albertson,* 34 N. Y. 584; *Holmes v. Mead,* 52 N. Y. 332. The last of these cases was decided in 1873, and all were cited and commented upon in *Ruth v. Oberbrunner* in 1876. Immediately thereafter our legislature entered upon the task of enacting the Revised Statutes of 1878, aided by three commissioners of broad learning and thorough intimacy with such subjects as those involved in chapters 95 and 96, R. S. 1878. They had *Ruth v. Oberbrunner* and the above-cited New York cases before them, and re-enacted the general prohibition against both perpetuities and trusts, with only certain specified exceptions in favor of certain charitable grants, to wit, those to literary or charitable corporations. Secs. 2039, 2081, R. S. 1878. The revisers' notes, communicated to the legislature as a basis for their action, make perfectly clear their understanding that the words used allowed no exception in favor of charities except those expressed in the amendment. They said:

"In section 2039 amendment is made to allow grants or devises in perpetuity to literary or charitable corporations. It

is thought that this ought not to be extended to religious corporations, but left only to those which are formed for advancing literary or charitable ends.    The decision in *Ruth v. Oberbrunner,* 40 Wis. 238, shows a defect in the law as it is, which is generally admitted to require amendment.    We have endeavored to afford it without too great innovation.    In that spirit it is provided that corporations under our laws can alone enjoy the benefit of such a grant, because they are within legislative control under the constitution, while they can readily be formed to possess all necessary powers for the full enjoyment of all the benefits which should follow such a provision in the law."

According to all canons of construction, such a history as this ought to exclude any supposition that the legislature in 1878 intended a further exception in favor of *all* grants for charitable purposes.    Such a supposition would convict them of utter redundancy in the newly enacted express exceptions. It would ignore the maxim, *expressio unius est exclusio alterius,* and would deny to the general words of prohibition their natural meaning and force.    As an original question of construction, we should feel entirely clear that any suspension of the absolute power of alienation, excepting those expressly exempted in the statute itself, for whatever purpose, charitable or otherwise, was intended to be prohibited by the legislature in 1878.    Such view of the legislative intent and understanding is confirmed by various enactments excepting grants for specific charitable purposes.    Illustrations are subd. 4, sec. 561*j,* Stats. 1898, authorizing grants to the board of control for any purpose connected with institutions under their management, and providing, "No such conveyance or devise shall be subject to the limitations provided in other cases;" also subd. 3, sec. 389, Stats. 1898, authorizing gifts for benefit of university, "without being subject to the limitations and restrictions provided by law in other cases." The latter enactment is understood to have been prepared by one of the commissioners who drafted sec. 2039, R. S. 1878.

The intent of the legislature being thus clearly established, is there any declaration of this court, which, as a binding precedent, should control our decision at the present time? Counsel point to *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, and *Gould v. Taylor Orphan Asylum,* 46 Wis. 106, 50 N. W. 422. An examination of these cases fails to disclose any attempt to construe our statute forbidding perpetuities in real estate. In response to very vigorous argument and citation of authorities to show that exception in favor of charities is made by the English courts, with whom, and not by statute, originated the rule against perpetuities in that country, the court said, in the former case (46 Wis. 95, 50 N. W. 1106):

"The English doctrine of perpetuities applied to estates both real and personal, and grew up by a series of judicial decisions. Perry on Trusts, secs. 377, 379. It appears to have been applied to private trusts, but not to trusts for charitable uses, which usually are essentially and indefinitely permanent. Perry, secs. 384, 687, 736;"

and then proceeded to quote from *Odell v. Odell,* 10 Allen, 1, 6, the reasons in support of such policy. No attempt was made to declare that our statute makers had adopted that policy, but the statutes were cast aside for the reason that they applied only to real estate, from which consideration the court proceeded to reason that all grants of personalty, whether for charitable or private uses, were intended to be relieved from any restraints as to perpetuities. That this was the ground of decision is rendered even more obvious by the accompanying case of *Gould v. Taylor Orphan Asylum,* where it is said (46 Wis. 117, 50 N. W. 423):

"The same view is taken of the will in this case as of the will in *Dodge v. Williams,* that the whole scope and tenor of the will demonstrate that the power of sale was mandatory, and that it is therefore to be considered as a will of personalty only. In this view, the principles upon which the charitable

bequests are sustained in *Dodge v. Williams* are as applicable to this as to that case."

That no exemption from the statute against perpetuities in favor of charitable grants of realty was declared in these two cases is fully confirmed by the next case on the subject, *De Wolf v. Lawson*, 61 Wis. 469, 21 N. W. 615, where was a devise of realty, in trust to rent the same for twenty years, and to pay the net rents to two specified churches for the support of the preaching of the gospel therein, admitted to be a charitable purpose. The devise was assailed by the successful counsel in *Gould v. Taylor Orphan Asylum*, and the opinion written by the same justice. They both assume, in brief and opinion, that the statute prohibits perpetuities in real estate for any charitable uses save only such as are expressly excepted by the amendment of 1878, and, notwithstanding a vigorous contention that such statute did not apply to charities at all, supported by citation of *Dodge v. Williams*, *Williams v. Williams*, and *Shotwell v. Mott*, the court decided this devise void because the express exception was too limited to include it. Surely, if *Dodge v. Williams* and *Gould v. Taylor Orphan Asylum*, had decided anything adverse to this, Cole, C. J., and Mr. Fish must have known it.

In *Webster v. Morris*, 66 Wis. 366, 28 N. W. 353, certain perpetual charitable trusts were sustained by holding that the estate was converted into personalty, and that "the statute applies only to real estate." Again, as already stated, the statute was applied to charitable devises in *Beurhaus v. Cole*, 94 Wis. 617, 69 N. W. 986, although counsel for the city urged its nonapplicability on the same grounds, and cited the same cases now relied on. Further, after *Harrington v. Pier*, already referred to, came the case of *Becker v. Chester*, 115 Wis. 90, 91 N. W. 87, 650, where this court, after great consideration and debate, decided to adhere to the conclusion reached in *Dodge v. Williams*, to the effect that by adoption of our statute prohibiting perpetuities in real estate our leg-

islature had, by implication, set aside the common-law rule against perpetuities in personal property. The only basis of reason upon which that conclusion could rest was and is that the legislature, in enacting sec. 15, ch. 56, R. S. 1849, intended to cover the whole field of perpetuities, to substitute entirely a statutory policy for the pre-existing court-made rule of policy of the common law. To hold that such intent was so clear that it must by implication annul the common law as to personalty, which was not within the express words of the statute, and at the same time to rule that it was not sufficiently obvious to exclude the common-law rule as to charities, which did fall within the literal words of the enactment, would be the height of inconsistency.

It is said, however, that New York, whose decisions, following those above cited, fully support the doctrine that the legislative scheme or policy was intended to wholly abrogate that of the common law, has changed its policy, and now recognizes charitable grants as unhampered; but this change of policy has not resulted from any modification of the views of its courts as to the construction, force, or effect of the statutes which we adopted and have maintained. It has been accomplished by the legislature, which in 1893 changed the former statutes. True, the enactment making the change was given a construction broader than some might think permissible, but none the less the change has been accomplished by the legislature, and not by the judiciary. *Allen v. Stevens,* 161 N. Y. 122, 55 N. E. 568.

Our conclusion on this subject is both that the statutes, as an original question of construction, prohibit suspension of the power of alienation for the forbidden period, whether the grant be for charitable or other purposes, save for the express exceptions; also that all the prior decisions of this court are in support of such a construction, and the question is not an open one in this state. If the policy is unwise, it can be further modified for the future by the legislature, without sacrifice

of rights acquired upon faith of the present statutes and the construction given thereto by this court during at least twenty-five years.

II. We must therefore proceed to consider whether the bequests and devises under which respondent claims do involve such suspension of absolute power of alienation as is prohibited by secs. 2038, 2039, Stats. 1898. Inspection of the will makes apparent that the testamentary scheme involves a division of the title into two stages, and a separation of the property itself into two, if not three, classes, to each of which stages of title and classes of property different rules of law may apply.

First, there is a period of three years in gross during which all the property is permitted to remain in the hands of three trustees, and is claimed to be inalienable within the prohibition of sec. 2039, Stats. 1898. While the question was perhaps an open one in Wisconsin at the time this case was tried at circuit, it is now settled that the present statute permits suspension of the power of alienation for a gross term not exceeding twenty-one years. *Kopmeier's Will,* 113 Wis. 233, 89 N. W. 134. Hence the ruling of the circuit judge sustaining the devise as against this objection has already been confirmed by this court.

Again, the contention that the fund to be realized out of all the property, real and personal, apart from the homestead, is so tied up in perpetuity, even after it reaches the city, as to be forbidden, is very completely overruled by the recent decision in *Becker v. Chester,* 115 Wis. 90, 91 N. W. 87, 650, and the cases there cited. We there held, in reaffirmation of the doctrine of *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, that neither statute nor rule of common law in this state prohibits perpetuities in personalty. We also held that the absolute power of alienation of real estate is not suspended, within the purview of the statute, when a trustee or other donee of the legal title is given power and au-

thority to sell and make conveyance of complete title. Such power and authority is by the present will expressly conferred both upon the intermediate trustees and upon the city with reference to all real estate except the homestead. This consideration suffices to overcome the contention in hand without passing upon the further question whether that authority to sell is not integral to so obvious a scheme to reduce the whole to a fund as to work an equitable conversion of the whole into personalty, within the doctrine of *Dodge v. Williams, supra,* and *In re Albiston's Estate,* 117 Wis. 272, 94 N. W. 169, and many intervening cases.

Thus we are brought to the question whether, after the homestead reached the city of *Oshkosh,* the absolute power of alienation was to be so suspended that the statute renders void the estate attempted to be conferred upon that corporation. That such estate was a future one at the time the will took effect cannot be doubted, for there intervened the vesting of legal title in the three trustees, *Bouck et al.,* for a term not exceeding three years. If the grant to the city was as trustee merely, with the equitable beneficial interest in others, suspension of the power of alienation would probably be obvious, for the instrument conferring the legal title upon the city by most obvious implication restrains it in perpetuity from ever parting with that parcel of land. Restraint upon alienation is not inconsistent with a mere legal title in trust for others, and its disobedience, or any abandonment of the enjoined use, may be prevented by a court of equity at the instigation of those who are to enjoy the benefits as *cestuis que trustent. Kopmeier's Will,* 113 Wis. 233, 89 N. W. 134. It becomes important, then, to ascertain what sort of title to the homestead the will directs to be conveyed to the city of *Oshkosh.*

In considering the quality of such title, it is first to be noted that the will nowhere declares that such land is to be held in trust by the city. The sole declaration is that the

property is to be conveyed to the city absolutely for use in constructing and maintaining a library building and public library upon the specified lots. Of course, the presence or absence of words declaring an estate to be in trust is not conclusive, though they may be more or less significant of the purpose in the grantor's mind. *Davies v. Davies,* 109 Wis. 129, 85 N. W. 201; *Kopmeier's Will,* 113 Wis. 237, 89 N. W. 134. The question is whether the testator's intent involved the elements of a trust as known to the law. The most important of those elements is a severance of the legal title with power of control over the property from the beneficial interest therein. If the donee of the legal title is to control and manage the property entirely for his own benefit, there is no trust. 1 Perry, Trusts (4th ed.) § 13. "A trust exists where the legal interest is in one person and the equitable interest in another." *Wallace v. Wainwright,* 87 Pa. St. 263. The trusts authorized by our statute must be "for the beneficial interest of any person or persons"—of course, other than the trustee. Subd. 5, sec. 2081, Stats. 1898. Mr. Perry says, *ubi supra:*

"But no person can be both trustee and *cestui que trust* at the same time, for no person can sue a subpœna against himself. Therefore, if an equitable estate and a legal estate meet in the same person, the trust or confidence is extinguished, for the equitable estate merges in the legal estate."

Obviously, a deed of premises to A., to be used by him only for a residence for himself, would not create a trust. It would create merely some form of legal title, either complete or limited, and the right to insist on such limits would be a legal one. The devise under consideration seems almost as simple as the last illustration. The land in question is given to be used as a site for a public library. The maintenance of a public library and ownership of a site therefor is one of the strictly corporate functions of the corporation to which legal title is given. Secs. 931–936, S. & B. Ann. Stats.; sec.

1, ch. II, and subd. 29, sec. 4, ch. VI, of Oshkosh charter (ch. 59, Laws of 1891). The only person to be benefited is the corporation, the city. True, every citizen as an individual is interested, but all of the citizens so interested together make up the corporation, the city of *Oshkosh*. It is indistinguishable in principle from a grant of land to be used only for a city hall or an engine house. If such parcel of land were conveyed to third persons, to hold in trust for the purpose of allowing the city to erect and maintain thereon its public library, or other specified municipal building, could there be any doubt that the city, as a corporation, would be the *cestui que trust* and the only party entitled to subpœna against the trustee to enforce such trust? Certainly none. But if the city be the owner of the beneficial interest when the legal title is held by another, it is no less so because that legal title is held by itself for the same uses. In case of an individual holding to his own use, as above illustrated, the absence of any trust is so plain that we find no decided case discussing it, except perhaps one cited by Perry, where the legal title descended to one already holding the equitable. *Goodright v. Wells*, 2 Doug. 771. But mental confusion seems to have been not infrequent in cases of corporations vested with legal title for a specified purpose. This perhaps is not surprising, as the mind naturally turns to a distinction between a corporation and the individuals composing it. The decided cases are numerous, however, which declare the conclusion that, if the use limited is distinctively and purely a corporate one, the corporation itself holds the beneficial or equitable right, which therefore merges in the legal title, if that also be held by it. The right of individuals interested in the use of the property is, as members, to compel the corporation to perform its duties as a corporation, not, as *cestuis que trustent,* to regulate its conduct as a trustee. *Williams v. Williams*, 8 N. Y. 525, 536; *Levy v. Levy*, 33 N. Y. 97, 117; *Le Couteulx v. Buffalo*, 33 N. Y. 333; *Wetmore v. Parker,*

52 N. Y. 450, 459; *Vail v. L. I. R. Co.* 106 N. Y. 283, 12 N. E. 607; *Fosdick v. Hempstead,* 125 N. Y. 581, 589, 26 N. E. 801; *Beurhaus v. Cole,* 94 Wis. 617, 627, 69 N. W. 986; *Fitz Gerald v. Big Rapids,* 123 Mich. 281, 82 N. W. 56; 2 Dillon, Mun. Corp. (4th ed.) §§ 566 *et seq.* We can see no escape from the conclusion that this homestead is directed to be conveyed to the city of *Oshkosh* for its own corporate use· as a municipal corporation; that both legal title and beneficial interest are held by it in the same, to wit, its corporate, capacity. Hence no trust is created or imposed upon it.

This being so, and the direction of the will being that the property be conveyed to it absolutely, with no limitation except such as results from the direction that a public library be perpetually maintained thereon by expenditure of all the income of the fund consisting of the devised property and the equal sum contributed by the city, the title taken is a fee; either fee-simple absolute or a base or conditional fee, according as the limitation be considered repugnant to the grant and void, or a valid condition subsequent upon which title shall determine. Sec. 2026, Stats. 1898; 1 Washburn, Real Prop. (5th ed.) 83. The taking of such complete title is, however, subject to the further inquiry whether the attempted limitations upon the use or disposal bring the situation within the statute against perpetuities, so as to render the attempted estate void. That, then, is the next question.

When a fee is granted, limitations inconsistent with a fee, either on the use or on the grantee's freedom of conveyance, are deemed to be void, as repugnant to the main purpose of the grant, unless, by reasonably direct language, disobedience of such limitations is declared a condition subsequent upon which the title conveyed is to terminate. The law does not permit the grantor to convey full title to land, and yet to restrain the conduct of the grantee with reference thereto in respects essential to a fee, though equity does recognize such

a power when, and only when, a trust is created as hereinbefore explained. *Saxton v. Webber,* 83 Wis. 617, 626, 53 N. W. 905; *Van Osdell v. Champion,* 89 Wis. 661, 665, 62 N. W. 539; *Zillmer v. Landguth,* 94 Wis. 607, 69 N. W. 568; *Kopmeier's Will,* 113 Wis. 233, 89 N. W. 134. If the limitations upon the city's use and disposal of the property conveyed to it "absolutely," and therefore in fee, are mere limitations, and so repugnant to the grant as to be void under the rule of the above cases, of course there is no suspension of power of alienation, for then the title would be in fee-simple absolute, with full power in the city to convey at any time. Whether that is the true situation we do not decide, for the view next to be expressed renders such decision unnecessary to the issues now presented.

If the intent of the testator was merely to vest a fee in the city upon condition subsequent that it should terminate and be divested upon failure to use the homestead as a library site, or to devote all income from the other property to maintenance of a public library, then, as we hold that no equitable title is created, it follows that the rest of the legal title is in some one else, either vested or contingent, or both vested and contingent. Either there is remainder to the class composed of the heirs of testatrix and those of her husband, or a reversionary right by descent in the heirs of testatrix alone. Whether one or the other is immaterial, for in either case the interest of remaindermen or reversioners is vested, within the definition of our statute pertaining to the subject of perpetuities (sec. 2037, Stats. 1898), which declares an estate to be vested "when there is a person in being who would have an immediate right to the possession of the lands upon the ceasing of the intermediate or precedent estate." Obviously, if the city's intermediate estate were to terminate at this moment, the persons entitled to take as remaindermen or reversioners are in being. This subject and the meaning of this statute are so fully treated in *Moran's Will,* 118 Wis.

177, 96 N. W. 367, that nothing more need be said thereon. If the future legal estate is vested, then the power of alienation is not suspended within the force of those words in our statutes, as explained in the *Moran Case.* *Coster v. Lorillard,* 14 Wend. 265.

We therefore conclude and hold that (a) the title conferred upon the city is not in trust, but a fee; (b) if the restraints upon use or disposal of the homestead are limitations merely, they are so repugnant to the grant as to be void; and (c) if a condition subsequent is imposed thereby, so that on breach of those limitations the fee is to determine, the future estate in possession dependent upon such condition is so vested that the absolute power of alienation is not meanwhile suspended; and, ultimately, that the devise first to trustees, and then to the city of *Oshkosh,* is valid.

It is urged by appellants that such conclusion as we have now reached conflicts with the decision in *Beurhaus v. Cole,* 94 Wis. 617, 69 N. W. 986, in which case two parcels of real estate were granted to the city of Watertown "in trust" to be used in perpetuity, one as the location for "a home for aged and poor people of the city," the other, outside the city limits, as "a driving park and agricultural grounds." The obvious distinction between the two cases is that in the present we conclude that no trust was created, while in the former it was conceded by both litigants and assumed by the court that the only title conferred on the city was in trust and as trustee, so that express or necessarily implied prohibition against alienation was effectual. Whether the court might have reached a different view as to the quality of the title granted as to one or other of the parcels of land, had the question been raised and investigated, we need not decide. Its ultimate decision was based on an assumed condition which does not exist here. It may properly be remarked, however, that there were circumstances in the *Cole Case,* absent here, tending to support at least the contention that only a trust

title was granted. The language of the will very clearly expressed such an intent. The purpose, certainly as to the home for aged and poor, was far less clearly for the sole and exclusive purpose of the municipal corporation, although it might have been sufficiently germane and aidful to its general purposes to enable it to accept a donation of property to be so applied. There is authority to the effect that a municipal corporation has inherent power to receive gifts of property in trust to promote purposes not so strictly municipal that a city could undertake them originally at general expense. *Maynard v. Woodard,* 36 Mich. 423, 426; *Chambers v. St. Louis,* 29 Mo. 543, 579; *Vidal v. Girard's Ex'rs,* 2 How. 127; *Perin v. Carey,* 24 How. 465, 505. Whether such power rests in our Wisconsin municipal corporations, however, we need not decide in distinguishing this case from *Beurhaus v. Cole,* for the reasons stated. If the assumption of a trust in that case was not warranted by the facts, it was by consensus of the litigants.

For the reasons stated, we hold that the assignment and distribution of certain portions of the estate to the trustees, *Bouck et al.,* for the purposes expressed in the final order of the county court, was in accordance with law, and, there being no other complaint of that order, that its affirmance by the circuit court was without error.

*By the Court.*—Judgment affirmed.

MARSHALL, J. (*dissenting upon a primary question, but concurring in the judgment*). The inspired apostle proclaimed more than 1800 years ago: "Charity never faileth." That sentiment has ever dwelt in the heart of man as the better part of him. It has been crystallized into the governmental system of every civilized community and in none more significantly than those blessed with the common law. Courts of chancery have been for centuries, and from their earliest history, its special guardian. In their administration it was

always assumed that the idea that "charity never faileth" was so thoroughly entrenched as the public policy of organized society that no written law should be deemed to involve an assault upon it in the absence of language therein specializing to the contrary. By that rule of construction no serious difficulty was ever found in excluding charities from the scope of general language in legislative enactments, not mentioning them specially, or from common judicial rules as to property, whenever the claim was made that freedom to deal therewith as regards conveyances thereof to charitable uses was invaded thereby. When devises of land to corporations were restricted by enactments in general terms, the court easily held that such dispositions nevertheless could be freely made for charitable uses; that if the law would not permit the corporation grantee to take, the rule should apply that "a trust shall never fail for the want of a trustee." When the courts came to deal with the statute of 43 Elizabeth, c. 4, defining specifically what should be deemed of a charitable nature, there was no hesitancy in holding that the scope of the enactment extended beyond the letter thereof, including everything within its spirit. "Charity never faileth" was the effective guiding star of chancery at every step, wherever there was room within the broad field of judicial power to follow it that far without violating any unquestionable law to the contrary. The same spirit has dominated the courts of this country no less than those of England, they assuming, as to statutory enactments regarding trusts and perpetuities, that charities were not in the legislative mind where not expressly mentioned. Having convictions along those lines coming from long and patient study of the history of the subject, ancient and modern, and convictions that our legislative and judicial history, as a whole, are in harmony therewith, notwithstanding a high regard for the deliberate judgment of my brethren, that commonly causes doubt as to the correctness of my own view when contrary thereto,—that the opinion in

this case at first impressed me with a feeling of astonishment, is most natural. Time for reflection, necessary for bearings to be taken regarding what judicial duty required from my standpoint—whether it would be satisfied by a mere protest or more was demanded—left me in such doubt as to any probability of good resulting from proclaiming my views, that silence in that regard for a time seemed best. But later it seemed that I had no right to take that course in the face of the many evidences we have of good springing from the free, independent personal expression of judicial views in a situation like this. "Cast thy bread upon the waters and ye shall find it after many days," may well be a guide in the circumstances before us, where such a great public question is involved. So, with faith rather than hope as to beneficial results, I take up the burden of discharging the duty that seems to call for the labor.

The public misfortune that would be involved in a loss of the great charity which the benevolent woman designed for the people of her city has been averted, but by pure accident, so to speak, since it does not seem likely that she, or her advisers, had in mind at the time her scheme was put in form that invention of courts, made to permit avoidance of the statute on the subject of perpetuities, that a conveyance to a corporation for a particular purpose of a charitable nature does not create a use or involve a trust implying an equitable title in others, but is a conveyance of the whole title subject to be defeated upon a condition subsequent; nor have in mind the conditions subsequent, expressly embodied in the devise,—*as a means of saving the creation* from being destroyed by the statute. It is not probable that any one concerned in the matter suspected want of power in the donor to do with her own what she wished, the purpose being public and there being no fatal indefiniteness in her creation.

It is much to be regretted that this court, upon a review of its entire judicial history, has reached the conclusion that it

must stand substantially alone in holding that the general language of statutes on the subject of perpetuities covers property devoted by deed or devise to charitable purposes. That the law is otherwise elsewhere, and well nigh universally so, we may safely assert. That cannot be successfully challenged. The courts of New York, though starting right, drifted with most disastrous results into error. This court followed suit to some degree, though not always consistently or fatally, as I shall endeavor to show, till this case was reached. After half a century of misfortune resulting from the departure from *Williams v. Williams,* 8 N. Y. 525, the New York court, in *Allen v. Stevens,* 161 N. Y. 122, 55 N. E. 568, declared, in effect, that its course in that regard was a most lamentable mistake and it proceeded to completely efface such mistake, pointing, it is true, to a legislative enactment as calling for such action, but without justification, it would seem, in the light of ordinary judicial rules. We will refer to that subject at length later.

Some reference seems proper, if not necessary, to the statement found in the opinion of my brethren, that counsel for respondent, in their brief, made an unwarranted use of *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345, in that they gave heed to *obiter* discussion in the opinion. The court used this language in the opinion here: "Counsel urge that expressions found in the opinion in *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345, invite the profession to believe the question is still an open one," referring, as will be seen, to the question of whether realty conveyed in trust for a charitable use is excepted from the statute on the subject of perpetuities. Now we have searched the brief of counsel with all the care we can devote to the matter in order to discover what "expressions" are referred to, but cannot find anything that at all satisfies the court's suggestion, except language to the effect that in the *Harrington Case* the reasoning and conclusion of the New York court in *Levy v. Levy,* 33 N. Y. 97,

and *Holmes v. Mead,* 52 N. Y. 332, were rejected, and the doctrine of *Williams v. Williams,* 8 N. Y. 525, approved. Such language, with the context thereof, fairly shows that what was said in the *Harrington Case,* which was in counsel's mind, without misapprehension as to its import, had reference solely to the question of whether charitable trusts must be tested by the essentials of private trusts as to definiteness of beneficiaries to enforce the trust. That must have been over-looked by my brethren. We venture the assertion that not a word can be found in the *Harrington Case* suggesting that the statute on the subject of perpetuities does not apply to realty in a case like this. Four minor subjects were presented for decision: First. Does the doctrine of equitable conversion apply to the facts? Second. Is the purpose to which the property was bequeathed of a charitable nature? Third. Must a charitable trust be tested by the essentials of a private trust as to definiteness of beneficiaries? Fourth. Is there any law in this state on the subject of perpetuities respecting personal property? No other question was decided or ad-verted to. *Williams v. Williams* was referred to with ap-proval as to the third proposition, it being said that while New York departed from the *Williams Case* so far that it took the aid of a legislative enactment to accomplish the re-turn, this court, though it went astray in *Ruth v. Oberbrun-ner,* 40 Wis. 238, made a quick return in *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103. That was distinctly affirmed in *Hood v. Dorer,* 107 Wis. 149, 82 N. W. 546. It is not involved in this case, and if it were of course no one would question the soundness of the previous decision. Fur-ther, care was taken in the *Harrington Case,* from the begin-ning to the end, to restrict the decision to personal property. It was therefore sufficient for the purpose of this case to so state. Why the occasion was taken to dignify the claim of counsel, if there were such claim, that there was a shadow of a reason for supposing the case went further, and make that

a basis for treating the subject of whether charities are within our statutory prohibition as to suspending the absolute power of alienation, we cannot perceive. It is suggested that the contrary doctrine in *De Wolf v. Lawson,* 61 Wis. 469, 21 N. W. 615, and *Beurhaus v. Cole,* 94 Wis. 617, 69 N. W. 986, was overlooked. Enough has been said to show that nothing decided on the subject in either of those cases was involved in the *Harrington Case.* There is not the remotest suggestion in either as to whether indefiniteness of beneficiaries is fatal to a charitable trust. There was, therefore, no occasion whatever to refer to them in the connection suggested by the court. *De Wolf v. Lawson* was referred to on another branch of the case as to a conclusion since affirmed and most distinctly in this case. Perhaps it would have been better, in connection with the express restriction of the decision to personalty, to refer to *Beurhaus v. Cole* as holding to a contrary rule as to realty. But, whatever the cause was for the omission, it was participated in by all the members of the court. That cause, in my judgment, was twofold: First, the case did not affect any question considered or decided; second, the question decided in the former case did not receive such consideration as to leave any lasting impression upon the mind of any member of the court.

It may be that that part of my brethren's opinion above discussed goes upon the theory that a proposition decided in the *Harrington Case,* though presented for decision and vital to the right of the matter in some aspects thereof, was not germane thereto because not necessarily decided, some other point being decisive of the case, in any aspect thereof, hence that such proposition might have been entirely omitted, and the discussion thereof be properly regarded as *obiter.* I cannot think for a moment that such a position would be considerately taken, and I have the strongest evidence thereof in this case where the grounds are stated for the decision, as we will hereafter show. If I am wrong in this, then the sugges-

tion for which I have endeavored to assign a possible reason presents a matter of great importance as regards the application of other cases to the primary subject under consideration, so we will give attention thereto.

We deem it well settled that it is proper to consider and decide every question on appeal that might influence the final result in any aspect of the matter. *Dodge v. Williams* is a striking example of that method of judicial treatment of a subject, and the regard which has been shown for the points decided by such treatment is a clear demonstration of what I have said. The case is peculiarly significant because what is there said in deciding a nonessential proposition, and the conclusion reached, after being referred to repeatedly by individual justices in subsequent cases as *obiter*, were later decided to be judicial determination of the highest importance. There, counsel who attacked the trust appealed to the statutes on the subject of perpetuities and trusts. It would have been sufficient for that to have said that such statutes were confined to realty. However, evidently considering that such treatment of the matter would not be in all respects a fair response to the argument of distinguished counsel in the case, the court proceeded to show that the policy that dictated the statutes did not include charities. On that, reference to the fact that the common-law doctrine was in harmony therewith was proper, and such reference, in effect, was a decision on the subject, holding that our statutes should be so regarded; yet the court, *ex industria,* kept the door open on that question as to realty, using language to indicate that what was said was not to be deemed an authoritative decision on that subject. The question was legitimately suggested for argument, and was decided, though not generally, because of the restriction which the court placed upon it. That must be so upon the general rule that all questions assumed to be involved and decided in reaching a conclusion on an ultimate issue are deemed to be as effectually solved as such ultimate issue itself.

For the case in hand, the decision as to the statute not apply-
ing to personalty and that the rule requiring definite bene-
ficiaries to enforce the trust does not apply to charities, would
seem to be sufficient to have completely disposed of the case;
yet the court proceeded to decide the further question that
might have been vital in a different aspect of the matter,—
whether the common law as to perpetuities was abrogated in
this state.   The conclusion reached, as we have before seen,
has been distinctly held to be unquestionably judicial (*Becker
v. Chester,* 115 Wis. 90, 91 N. W. 87, 650), though it had
been frequently referred to as *obiter,* somewhat upon the
theory which we now feel called upon to criticise.   *De Wolf
v. Lawson,* 61 Wis. 469, 473, 21 N. W. 615; *Webster v. Mor-
ris,* 66 Wis. 366, 28 N. W. 353.

We will now take up the task of comparing the situation
in New York, when it returned to the doctrine of *Williams v.
Williams,* with our own, endeavoring to show that the insur-
mountable difficulties to our doing likewise do not exist.

When our statutes were adopted the law of New York,
without room for sound controversy, was supposed to be
clearly voiced in *Shotwell v. Mott,* 2 Sandf. Ch. 46, decided
in 1844.   That decision, it must be assumed, was familiar
to those responsible for our initial legislation at the time
thereof.   Therein, by the most emphatic language, it was held
that the statutory system of New York did not deal with
trusts for charitable purposes, and, inferentially, that convey-
ances for such purposes were not governed by general statutes,
but by common-law principles.   Perhaps it is true that in
adopting such system here four years later it cannot be
claimed that such construction was irrevocably embodied
therein under the general rule on that subject; yet to reject
it as not having any weight at all, worthy of mention, in re-
gard to the legislative purpose, would not seem to be proper.
We should not treat the decision as of such little importance,
in view of the fact that it is now dignified by the highest

court of New York as containing the very germ principle of the whole discussion on the other side of the controversy, and, in substance, all that was said later in the more extensive discussions of the matter in such court. In that opinion we have distinguished company. No one would claim that Mr. Dixon, after having presided over the deliberations of this court for many years, would, soon after his retirement therefrom, have urged upon it, in the capacity of attorney, a principle which he would not have declared to be the law had he been in a situation to do so. With that preface I quote what he said in the argument in this court in *Ruth v. Oberbrunner*, 40 Wis. 247:

"The statute, modified as we find it, was adopted in this state in 1848. It had then received a judicial construction in New York [referring to two cases, *Shotwell v. Mott* being one of them]. . . . They were received as the law of the state, and were never judicially questioned until 1850; and they have since been affirmed by the most carefully considered decision of the court of last resort, and the rule of that decision has been the established judicial construction of the statute for twenty years. With such judicial construction, so previously given, and so subsequently ratified and confirmed, the statute was adopted here; and by that construction this court is bound. And by that construction, charitable uses and trusts are excluded entirely from the statute."

As above indicated, *Shotwell v. Mott* was followed by an unqualified adoption of the doctrine thereof in *Williams v. Williams,* the same being broadened out so as to plainly include all questions as to the power of the court to deal with trusts for charitable purposes, characterized by indefiniteness of beneficiaries, and those as to the validity of conveyances by devise or otherwise for charitable uses, regardless of the statutes on the subject of trusts and the right to suspend the absolute power of alienation. Three years later, in *Owens v. Missionary Soc.* 14 N. Y. 380, it was overruled as to the power of a court of chancery to administer a trust with in-

definite beneficiaries, upon the supposition that such power depended upon the statute of 43 Eliz. c. 4. That was long ago generally repudiated; the New York court not being an exception (*Allen v. Stevens,* 161 N. Y. 122, 55 N. E. 568), nor the supreme court of the United States (see *Girard's Will Case,* 2 How. 127; *Perin v. Carey,* 24 How. 465; *Kain v. Gibboney,* 101 U. S. 365), which latter court was chiefly responsible for the heresy at the start. *Baptist Asso. v. Hart's Ex'rs,* 4 Wheat. 1. If there be now any exception to the general repudiation of the false doctrine, it is one of little importance. The invasion of *Williams v. Williams* on that point is the one and the only one which the legislature of New York specifically, or at all, so far as we can discover looking to the act itself, gave the court aid to efface. That will be fully shown later. Other phases of *Williams v. Williams* furnished subjects for judicial controversy, without the one specially referred to being treated as absolutely closed, for a long period of years. In *Bascom v. Albertson,* 34 N. Y. 584, decided in 1856, all that remained of *Williams v. Williams* after the first invasion thereof was so clearly uprooted that it would seem that no room was left for any future contention, though the early decision, for years theretofore, had been regarded as of little authority. However, like Banquo's ghost, the subject would never down. It seems that the saying:

> "Truth, crushed to earth, will rise again;
> The eternal years of God are hers.
> But Error, wounded, writhes in pain,
> And dies among her worshippers."

was yet to be demonstrated to its fullest extent. In *Holmes v. Meade,* 52 N. Y. 332, the fundamental error in *Owens v. Missionary Soc.,* that judicial authority to administer a charitable trust depended upon the statute of 43 Elizabeth and that its repeal in New York left the courts there helpless in the matter, was repeated, and in the *subsequent decisions* holding that the general language on the subject of trusts and.

perpetuities covers conveyances for charitable purposes, all controversy over the matter was in effect said to be completely closed. That left the overruling of *Williams v. Williams* so strongly entrenched that much courage was required on the part of the judiciary and the profession to again venture upon any discussion of the matter; yet the importance of saving to humanity the inimitable offer, from the point of sight of the time thereof, held out by Samuel J. Tilden to his countrymen—one that, made effective, would have dignified him for all time as one of the most distinguished philanthropists of his own or any age—stimulated the court and all concerned to a vain attempt to find some way of escaping from the consequences of the complete effacement of the sound doctrine first established. In this there is no overdrawn picture of the situation in New York, when it is said that the legislature reached out and rescued the judiciary. The law upon the point respecting which legislative aid was in words extended had been settled expressly, and resettled over and over again, the whole extending over a period of nearly fifty years; and settled upon all other phases of *Williams v. Williams* for about twenty-five years, the initial case in that regard having been repeatedly reviewed and affirmed until it would seem that, if a court can so settle a matter as to leave no possible way open for a change of position, the New York court had attained that end.

Lest it be thought that this opinion contains undue criticism of the New York court, before we are through we will verify what we have said by quoting from the language used by the eminent chief justice who wrote the opinion in *Allen v. Stevens.* We yield to no one in respect for that distinguished court. That it drifted into error after *Williams v. Williams* is but one of the many evidences that courts, however able, are presided over by men, hence, in the nature of things, must be fallible in fact, however much, in a legal sense, within particular cases, they are deemed to be infallible.

Having now given the situation faced in *Allen v. Stevens,* we turn to the history of the subject here. In the first place we have the significant circumstance that we took the New York system with a full and clear exposition thereof,— one which, while not irrevocably binding upon this court as part of the system itself, yet so strongly evidenced the legislative view of the matter when such system was adopted, that by the most familiar rules it should have been deemed binding here in the absence of some overruling decision in the parent state and some strong reason for following it. The New York legislature, in its initial action, had no such guide.

In *In re Taylor Orphan Asylum,* 36 Wis. 534, this court asserted, in language of the plainest character, that the jurisdiction of our judicial system included all that of common-law courts of chancery in superintending and compelling the execution of trusts for charitable uses, such power extending to corporate as well as private trustees. Witness the language of the court:

"In cases of charity, to be administered by trustees, whether private persons or corporations, a court of equity has jurisdiction, at the instance of the attorney general or other proper party, to take an account, and to correct abuse or misuse of the trust funds; and even to remove delinquent or improvident trustees. . . . The court puts itself in motion, without suit or suitor; and this, not blindly or arbitrarily, but in conformity with wise and settled usage. . . . In the absence of a visitor of right or by appointment, the visitatorial power would probably devolve upon the state, and be exercised by or under the authority of the circuit court."

The statute "does not confer the jurisdiction; it only gives the summary proceeding, in furtherance of a jurisdiction already inherent in the court."

The conflict between this court and that of New York at the time that language was used will readily be observed without stopping to point the same out. The doctrine respecting the power of the court over charitable trusts, and that beneficiaries to appear in court for the purpose of moving it in the

matter are neither essential nor possible, because indefiniteness of beneficiaries is a characteristic of a trust for charity,—has never been disturbed here, other than in the cases to which we will allude, which, we will show, have long since been overruled. The line of cases thoroughly entrenching the principle, after the one to which we have referred, are *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103; *Sawtelle v.. Witham,* 94 Wis. 412, 69 N. W. 72; *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345; *Hood v. Dorer,* 107 Wis. 149, 82 N. W. 546. So much for the statute law here on the only subject expressly covered by the New York act,—the legislative aid, supposed to be so significant.

In *Ruth v. Oberbrunner,* 40 Wis. 238, it was said expressly, that the statute on the subject of trusts, and, inferentially, the statute on the subject of perpetuities, extended to and included conveyances for charitable purposes. In the opinion the court followed so closely the decisions of New York, as to the subject of judicial power to administer a charitable trust, as to pretty clearly suggest that the question was an open one here, not referring, however, to *In re Taylor Orphan Asylum,* to which we have alluded. It is significant in that respect that Chief Justice RYAN, who wrote the opinion in the former case, did not participate in deciding the latter and that subsequently he took occasion to absolve himself from all personal responsibility for what was there said. *Heiss v. Murphey,* 40 Wis. 276, soon followed, where the New York doctrine, that a conveyance for a charitable purpose with indefiniteness of beneficiaries to appear in court and enforce the trust is void, was adopted, it being apparently overlooked that the parent view was that judicial power in that regard was dependent upon the statute of 43 Elizabeth and that the same was not in force in New York, having been expressly repealed at an early day. The features of both of those cases to which we have referred were expressly discredited as not being binding judicial authority or sound

law in *Dodge v. Williams,* Chief Justice RYAN writing the opinion, and remarking that neither of such features was involved in such cases; that there was no question of charitable use in either, and no question of trust in *Heiss v. Murphey;* that the trust failed properly in *Ruth v. Oberbrunner* because it was private and offended against the statutory requisites as to such trusts; and that the devise failed in *Heiss v. Murphey* because it was direct in fee to unascertained and unascertainable persons. That plainly suggested that the decisions should have been different but for such circumstances. With that disposition of these two early cases, which has never been overruled or criticised, why they should now be referred to as authority is not perceived. In the later case, at the very outset the question was up for decision, of whether the two former decisions were or were not to be regarded as authority, a decision in the negative being reached with the concurrence of the learned justice who wrote the matter condemned. It is significant that in *Gould v. Taylor Orphan Asylum,* 46 Wis. 106, 50 N. W. 422, decided at the same time, opinion by such justice, there was an unqualified concurrence in the criticisms of the early cases and in the principles announced in connection therewith, so far as the court deemed the same applicable to a discussion and decision of the ultimate question involved, namely, whether the bequest of personalty for charitable purposes there under consideration was valid.

My brethren refer to the quotation in Chief Justice RYAN's opinion in *Dodge v. Williams,* taken from *Odell v. Odell,* 10 Allen, 1, as if it were a mere oratorical flourish, so to speak, used to embellish the opinion, saying that it was used without any intention of declaring "that our statute-makers had adopted that policy," the statutes being "cast aside for the reason that they applied only to real estate;" the court then proceeding "to reason that all grants of personalty, whether for charitable or private uses, were intended

to be relieved from any restraints as to perpetuities," rest-
ing the decision of the case on that ground. That position is
beyond my comprehension for these reasons: Chief Justice
RYAN, in treating the matter before the court, took up the
different positions of counsel attacking the trust, one by one,
showing each to be untenable, expatiating from first to last
upon the great importance always attributed to the mainte-
nance of charities, and indicating that the policy of the law
in that regard had not changed. He took up the subject of
mortmain regulations, construing the term in its popular
sense—that it extends to gifts of land or money for chari-
table purposes generally,—saying that such restraints exist
only where the policy of the law is to place restrictions upon
such gifts which would result in the creation of perpetuities.
Much space was taken up by the learned chief justice upon
this branch of the opinion, showing that the mortmain law
of England never became in any sense a part of our system,
either as a part of the common law or by any legislative en-
actment. He pointed to the significance of there being no
legislation on the subject as conclusive evidence of our legis-
lative policy, closing with these words:

"When charitable bequests in this state begin to outrun
reasonable provision for the poor, and seriously impede the
alienation of property, it will be time enough for a statute
of mortmain. The silence of the legislature hitherto, and the
observation of all men, are sufficient to show that the time
has not yet come, if it ever should."

When we remember that it was then the law of New York
that the abolition of the common-law system of charitable
trusts and the substitution in its place of a system allowing,
in effect, conveyances of property to be held in perpetuity for
charitable purposes by means of a corporate grantee with
powers expressly defined by the legislature, was to all intents
and purposes a system of mortmain restrictions and was so
held (*Wetmore v. Parker,* 52 N. Y. 458; *Bird v. Merklee,*

144 N. Y. 544–555, 39 N. E. 645), public trusts being entirely done away with (*Holmes v. Mead,* 52 N. Y. 332), and when we reflect that this court, as then organized, was perfectly familiar with that fact, the conclusion seems irresistible that in saying that which we have quoted, it was intended to decide that the restriction in New York upon charitable trusts did not exist here.

After disposing of the first proposition in *Dodge v. Williams* as indicated, this was stated as a matter to be decided:

"Strenuous objections to the charitable bequests in the will before the court, were founded on the statutes prohibiting perpetuities, and regulating uses and trusts."

That was treated under three heads, either being deemed an effective answer thereto in favor of the trust. These are the heads: (1) Does the statute apply? (2) If not, does the common-law rule respecting perpetuities as to both real and personal property apply? (3) Is the common-law rule respecting perpetuities in force in this state? Each was treated and answered in favor of the maintenance of the trust under consideration. As to the first it was said:

"It is almost sufficient to say, for the purposes of this case, that both of these statutes are expressly limited to realty."

Note the significance of the words *"almost sufficient,"* clearly indicating that the other propositions, yet to be treated, were regarded as important. As to the second it was said that the policy of the common law respecting perpetuities does not extend to trusts for charitable purposes. Then, speaking presently, using the language of an eminent judicial writer, obviously for the reason that it perfectly expressed what was in the mind of the court—language which included citations of decisions made under both common law and the statutory system from which ours was taken,—this was said:

"This rule of public policy which forbids estates to be indefinitely inalienable in the hands of individuals does not apply to charities. These being established for objects of

public, general and lasting benefit, are allowed by the law to be as permanent as any human institution can be, and courts will readily infer an intention in the donor that they should be perpetual. If an alienation of the estate becomes essential to the beneficial administration of the charity, it may be authorized by a court of chancery;"

thus plainly disposing of the proposition of whether the common law policy as to charities had been changed by any legislative enactment, in favor of the negative. Taking up the last proposition, it was said:

"But were this otherwise, the statute limiting the rule against perpetuities to realty, manifestly abrogates the English doctrine as applicable to personalty."

If there is not a clear decision of the three independent propositions, each treated as sufficient in itself to support the final judgment and each in that regard being well nigh as important as the other, I must admit that I am unable to understand plain English language and apply it to elementary principles as to what is and what is not to be regarded as decided in a case. If I am not right, then what becomes of that doctrine, found everywhere in the books treating upon the subject,—that which has been announced over and over again by this court: that every proposition assumed to be in a case, treated and decided as a basis for a final judgment, is to be deemed to have been as effectually decided as the ultimate question passed upon? *School Trustees v. Stocker,* 42 N. J. Law, 115; *Giffert v. West,* 37 Wis. 115; *Quackenbush v. W. & M. R. Co.* 71 Wis. 472, 37 N. W. 834; *South Bend C. P. Co. v. George C. Cribb Co.* 105 Wis. 443, 81 N. W. 675; *Becker v. Chester,* 115 Wis. 90, 127, 91 N. W. 87, 650; *Pray v. Hegeman,* 98 N. Y. 351.

The significance of the foregoing warrants us in emphasizing the fact that the idea that the result in *Dodge v. Williams,* 46 Wis. 70, 50 N. W. 1103, and its companion case rested wholly on the decision of the proposition as to whether the common-law rule regarding perpetuities respecting person-

alty was in force in this state, gives such dignity to that. which was a subject of discussion from *De Wolf v. Lawson,* 61 Wis. 469, 21 N. W. 615, to *Becker v. Chester,* 115 Wis. 90, 91 N. W. 87, 650, covering a period of nearly twenty years, as to whether it was not wholly *obiter,* the decision being based wholly upon other propositions, as of itself to suggest fatal infirmity therein. In *Becker v. Chester,* where the controversy ended, as indicated by my brethren, it was not till after the most earnest discussion and careful consideration that we were able to reach a conclusion that what was said upon the point by Chief Justice RYAN should be regarded as a judicial determination. The most that we then ventured to say was that the proposition involved was presented for decision in the case, that it was one proper to be decided, that it was decided, and *"was one of the grounds upon which the judgment of the court was pronounced;"* hence that the decision thereof was an authoritative judicial determination of the matter under the rule we have stated. Even then, the chief justice, in a very learned and exceptionally elaborate opinion, insisted that the language of the former case was not a binding adjudication, because it was not only fundamentally wrong, but was extra-judicial *dicta,* the chief justice being so powerfully moved by his convictions in the matter that he felt justified in characterizing the decision of his brethren as a *"judicial monstrosity."* I should say in passing that I do not repeat that with any spirit of criticism. It is done only to give added significance to the circumstance, *that the position which the court now assumes in saying that what was supposed to be decided in Dodge v. Williams, but from De Wolf v. Lawson to Becker v. Chester was by some members of the court regarded as a judicial determination in fact and by others as mere obiter, is substantially the only matter which the court in the early case and the one decided with it rested the judgments upon; and further that the justice who first thereafter cast doubt upon the*

*judicial character of such early determination is the one who,
at the inception thereof, gave to the same the special signifi-
cance indicated.*

But to recur to the question of whether the court, in *Dodge
v. Williams,* used the language as to the policy of the law on
the subject of perpetuities not including charities as a mere
oratorical embellishment of the opinion, there being no inten-
tion to suggest that such policy was recognized in our stat-
utes. Significance is given to the language of Justice Cole's
opinion in the companion case:

"It is therefore to be considered as a will of personalty.
In this view the principles upon which charitable bequests
are sustained in *Dodge v. Williams* are as applicable to this
as to that case."

We see in that a reference to the principles generally de-
cided in *Dodge v. Williams,* respecting the matter, and not to
one of them only. It seems that the learned justice referred
to all that the court in the former case assumed to be vital
for the purposes of the decision thereof, even though the de-
cision of one of them might have been sufficient upon which
to base the judgment. That Justice Cole did not refer spe-
cifically to the subject of whether the common-law rule, re-
specting perpetuities was abrogated by statute as to person-
alty, must be clear from the fact, before indicated, that he
later regarded what was said in *Dodge v. Williams* on the
subject as merely the personal views of the chief justice.

From what has been said it would seem that no obstacle
can be found in our judicial history to the adoption of the
doctrine of *Williams v. Williams,* in anything decided until
after 1879 and it would not be claimed that any decision
prejudicial to such adoption was rendered thereafter till *De
Wolf v. Lawson,* in 1884. That is suggested as directly in
point. The devise there in controversy was to executors to
pay rents and profits in equal proportions for a period of
years to the trustees of the Baptist and Methodist Church so-

cieties of the village of Delavan for the support of the preach-
ing of the gospel in the several places of worship of said
churches respectively. It will be noticed that the church so-
cieties, as organized bodies, were made beneficiaries. The
prime essential to a trust for charitable uses did not char-
acterize the trust. The common saying is that charity begins
only where definiteness of beneficiaries ends. Here the bene-
ficiaries were certain and unchangeable. It is the indefinite-
ness of beneficiaries characteristic of a trust for charitable
purposes that gives rise to the power of the state, through judi-
cial agencies, set in motion if necessary by public authority,
to enforce the trust. Without that there can be no public
trust. It is on that theory that the New York court held that
there were no public trusts in that state. It is said in the
opinion of my brethren that the support of the Christian re-
ligion is admittedly the proper subject of a charitable trust.
True, but the support of a particular church corporation, in
respect to its legitimate corporate expenses, may not be a
proper subject of a trust for charity, if the corporation and
not the congregation is deemed the beneficiary. There is
much reason and authority for that, and it seems that in the
case under discussion that was recognized.

It is said by my brethren here that in the brief of counsel
and in the opinion of the court there it was assumed that the
trust was one for charity. We do not so understand it. Coun-
sel argued the question briefly, saying that charitable trusts
were not excepted from the statutory regulation as to per-
petuities, citing *Ruth v. Oberbrunner,* 40 Wis. 238, which
had been overruled, as we have seen. In the opinion there
are at least three significant circumstances leading to the con-
clusion that the trust was regarded as private by the court:
First. Although the question was raised by counsel, there is
not a word from the beginning to the end of the opinion re-
ferring to the trust as one of a charitable nature. Second.
One of the mooted questions was whether the trust was char-

itable. In support of the trust counsel pointed to *Dodge v.*
*Williams.* Justice COLE criticised what was there said as to
the statute having abrogated the common-law rule as to per-
petuities, using this language: "It may, however, admit of
doubt, whether the remark of the chief justice is strictly ac-
curate *when applied to private trusts."* Why thus, *ex in-*
*dustria,* leave the language of Chief Justice RYAN undis-
turbed as to charities? Why refer to it at all? We see no
purpose thereof whatever, unless the court understood that
the trust in hand was of a private character and to be tested
by the law regarding private trusts. In harmony with that
the ancient law as to such trusts was discussed by the learned
justice, this language being used for a conclusion: "There-
fore, the law would only allow the testator to *tie up his prop-*
*erty for a private trust* for a life or lives in being and twenty-
one years and nine months." Third. When the court came to
deal with the exception in the statute respecting perpetuities,
it was said that a church corporation *is not a charitable cor-*
*poration* within the legislative intent. It will be noticed that
the present chief justice dissented, but whether on the ques-
tion thus decided or not we are not in a position to state. The
holding as to the character of a church corporation shows that
strict rules of construction were applied to the statute, not
those liberal rules commonly supposed to always rule in such
matters. That within such rules such a corporation is of a
charitable character needs no discussion. *Andrews v. An-*
*drews,* 110 Ill. 223. By such strict rule it seems the court
viewed the matter, and thus unmistakably treated the trust
as private. As before suggested, the beneficiaries were two
church societies. There was nothing indefinite in that re-
spect. They could appeal to the court to enforce the trust.
Public agencies could not deal with the matter indicated in
*In re Taylor Orphan Asylum,* for the very obvious reason
that the trusts were not public, being for two definite, legal
entities, unchangeable in character, for their legitimate cor-

porate purposes. The view entertained by Justice Cole, that in such a case the corporation, and not the members thereof, is the beneficiary, followed to its ultimate conclusion called for a treatment of the matter in hand as we suggest that it was treated.

*Beurhaus v. Cole,* 94 Wis. 617, 69 N. W. 986, decided in 1897, remains to be considered. The effect of sec. 2038, Stats. 1898, upon trusts for charitable uses was there presented for decision. It was decided, but without, I venture to say, much study of the subject, it being taken for granted that the statute governed. The opinion indicates that. I take my full share of the responsibility and confess, for myself, that I did not give the matter the attention that it ought to have received, not then appreciating the condition of the law, as the study of recent years has enabled me to do. There is little more that can be said as to the *Beurhaus Case.* It is now six years old. The proposition there passed upon was regarded, it seems, as an original question. No previous adjudication of the court was referred to. So little study was devoted to the subject that when the whole field respecting charities, as it appears in our books, passed in review in *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345, three years later, neither the writer of the opinion who endeavored to collate every decision previously made here touching the subject, nor any other member of the court, recalled the case. Doubtless if the later case had involved directly the question previously decided it would have been brought to the attention of the court by counsel, or, if not, the court would have recalled it. Certainly, the decision is too fresh to be a bar to the court's now declaring the law correctly, if a mistake was then made.

Having now shown that while the New York court had a series of decisions departing from *Williams v. Williams,* 8 N. Y. 525, covering nearly half a century, when *Allen v. Stevens,* 161 N. Y. 122, 55 N. E. 568, was decided, and that

we have, even by the court's view, but two adjudications of that character, covering a period of nineteen years, and in my judgment but one, recently decided as aforesaid, it would seem that we need not hesitate to return to sound principles as New York has done, upon the plea that we have no legislative aid in the matter, even if it were true that the New York court had such aid of a substantial character.

To give proper point to the foregoing, one must have in view the precise language of the New York act. We give it here:

"SECTION 1. No gift, grant, bequest, or devise to religious, educational, charitable, or benevolent uses, which shall, in other respects be valid under the laws of this state, shall be deemed invalid by reason of the indefiniteness or uncertainty of the persons designated as beneficiaries thereunder in the instrument creating the same. If in the instrument creating such a gift, grant, bequest, or devise there is a trustee named to execute the same, the legal title to the lands or property given, granted, devised, or bequeathed for such purposes shall vest in such trustee. If no person be named as trustee then the title to such lands or property shall vest in the supreme court.

"SECTION 2. The supreme court shall have control over gifts, grants, bequests, and devises in all cases," etc. "The attorney general shall represent the beneficiaries in all such cases and it shall be his duty to enforce such trusts by proper proceedings in the court." Ch. 701, Laws N. Y. 1893.

By comparing this with what has been said, it will be easily seen that the essential features of that law are thoroughly entrenched in our jurisprudence without any legislation whatever. That is of such importance that it will bear reiteration. It will be noted that the legislature, *ex industria*, negatived any purpose to make any trust valid theretofore considered invalid, except so far as expressly otherwise provided, thus, it would seem, plainly saying that so far as charitable trusts were affected by the statutes on the subject of perpetuities, such effect remained as before. Leading

up to a construction of the act, after referring most approvingly to *Williams v. Williams* as stating exhaustively and truly the law as it was at the time thereof and should have continued to be, this sweeping criticism was made in *Allen v. Stevens,* of the numerous decisions that had invaded it:

"That decision, it would seem, should have settled the question in this state; but the struggle between the advocates of a liberal policy towards charities and the opponents of such policy did not stop with such decision."

Thus it. will be seen that the contention between the advocates of the two policies was given only the dignity of a struggle between rivals respecting sound public policy.   The court gave the history of that struggle in detail, till it resulted in the complete success of the opponents, spoken of, since which time, it was said, *"No attempt to create an original charity has survived the test of an application by the courts of the rules of law to the language employed by the testator."*   Numerous instances were cited of devises and bequests of great importance to the public failing by the unfortunate departure from the early position of the court; and it was said, in effect, *that the great wrong thus inflicted, and the means thereof, needed no comment;* that from the point of sight where the judicial history and its effect upon the public could be measured, "the legislature could discover nothing but wrecks of original charities, charities that were dear to the hearts of their would-be founders, and the execution of which would have been of inestimable value to the public;" but that prior to that period it could be seen that, had it not been for the disturbance of the salutary doctrine of *Williams v. Williams,* holding that charitable trusts were "not subject to strangulation by the rule against indefinite beneficiaries, the mischiefs referred to would not have occurred."   The legislature "not only saw that a great wrong had been and was being done to the public by the loss of many devises and bequests for the purpose of founding orig-

inal charities, but it further saw that the remedy could only be furnished by it." From that the conclusion was reached that, notwithstanding a disturbance of the law as established by the courts respecting perpetuities was not mentioned in the act, and notwithstanding the letter thereof expressly repudiated any such purpose, the act completely restored the doctrines of *Williams v. Williams.* That, it seems, was accomplished by a process of reasoning which, in a vigorous dissenting opinion, was properly said to be unsound in the highest degree; and, we add, a process which seems unjustifiable except upon the doctrine, hardly having a proper place in judicial matters, that the end justifies the means,— an exhibition of judicial heroics, so to speak, which has no parallel in the books, so far as I am acquainted therewith. No one, it would seem, could read that case without concluding that, if so trifling a legislative aid were sufficient to justify a court to return to sound doctrines, none is required here.

This other significant circumstance, which distinguishes our court from that of New York as regards departing from ancient landmarks, must not be overlooked. There, in conformity to the construction of the statutes given, that they included trusts for charitable uses, it was held that a devise or bequest for such a use to a corporation to be formed is void unless such corporation is by the terms of the devise or bequest to be called into being within the time allowed for the vesting of future estates. *Tilden v. Green,* 130 N. Y. 29–47, 28 N. E. 880; *Burrill v. Boardman,* 43 N. Y. 254; *Shipman v. Rollins,* 98 N. Y. 311. Here, when there was a difference of opinion as to whether the common-law rule regarding perpetuities respecting personal property was in force, it was held that a bequest for the use of a corporation to be formed, no provision being made as to the creation thereof within the time that the future vesting of the title might be suspended, was good (*Webster v. Morris,* 66 Wis. 366, 28 N. W. 353),

following the general rule on the subject, *which depends wholly upon the doctrine that charities are excepted out of all rules statutory or otherwise, as to perpetuities, and on the judicial function respecting cy pres power.* Gray, Perpetuities, §§ 608, 609; *Russell v. Allen,* 107 U. S. 163, 2 Sup. Ct. 327; *Schmidt v. Hess,* 60 Mo. 591.

Another insurmountable obstacle said to exist to our lining up with the general rule that charity is excepted from the general rules, statutory or otherwise, on the subject of perpetuities, is that, where it prevails in the face of written laws in letter declaring to the contrary, the statutory system is different from ours. On that, all opposing authorities seem to have been easily set aside. I dissent from the suggestion that any such diversity of systems exists. Those elsewhere are precisely or substantially like our own, as I read them. Whatever difference exists between the provisions here and those elsewhere, are not in the systems, but in the different views thereof, which is really attributable to the circumstance that in such struggles as that spoken of by the New York court the advocates of applying to written laws those liberal rules that were so effective at common law in excluding charities from general restrictive policies, legislative or otherwise, did not always prevail. To be convinced that such is the case, one has but to compare our statute and the decision of this court now made, with those of Indiana, California, and many other states. *Richmond v. Davis,* 103 Ind. 449, 3 N. E. 130; *Estate of Hinckley,* 58 Cal. 457. In Texas, in face of a constitutional prohibition against perpetuities, it was held that charities were not included therein. *Paschal v. Acklin,* 27 Tex. 173, 196; *Bell Co. v. Alexander,* 22 Tex. 350. In 5 Am. & Eng. Ency. of Law (2d ed.) 902, it is said that charitable trusts are not within the rules against perpetuities, nor are they affected by or within the scope of the statute.

It is said that, to hold that the adoption of that feature of

the common law as to perpetuities respecting realty, only, impliedly repealed the common law on the subject as to personalty, and at the same time to hold that it did not exclude the common law as to charities, would be the height of inconsistency. That means this, I take it: to hold that an enactment as to one part of the common law relating to a specific subject, such law being the outgrowth of a particular policy, adopting only a part thereof, inferentially repeals the remainder; and yet that the common law on another specific subject, governed by a radically different policy, was not included therein, though covered by the letter thereof, is inconsistent to the highest degree. To my mind the very opposite is the reasonable and only reasonable view of the matter. The policy of the common law as to charities was so radically different from that regarding property generally, the one being highly favorable to perpetuities and the other as highly unfavorable thereto, that to say that legislation on one subject adopting part of the common law as to that, in general language, and by silence dropping the other part, must be held to include all of the law found as to the opposite policy because falling within the letter of the enactment, would be illogical to the highest degree. On the principle involved we certainly have most distinguished company, in the supreme court of the United States, and courts and writers generally, as we have seen.

Now a word as to whether sec. 2039, as amended by the Revision of 1878, in connection with the explanatory note of the revisers, should have the effect which the court has attributed thereto. The revisers were all distinguished for their general learning and professional attainments. Two of them, subsequent to their work upon the statutes, became honored members of this court, and performed official services here of inestimable value. The others were their peers in knowledge of the law. I yield to no one in respect for the collective judgment of those men. If it includes what my

brethren suppose, and the idea was incorporated into the stat-
utes, then the decision from which I dissent is right and the
law should be so declared, leaving the responsibility for the
result to rest with the legislature. But to my mind, the words
of the revisers and the result of their advice with the legisla-
ture, in connection with what almost immediately followed
in this court, tells a far different story from that which the
court has read therefrom. As we have seen, up to *Ruth v.
Oberbrunner*, 40 Wis. 238, the only decision of importance
in this court, touching the subject of charities, was *In re
Taylor Orphan Asylum*, 36 Wis. 534, in which, without ex-
pressly referring to all points of this subject, the judicial
view clearly indicated is that the common law had been in no
respect disturbed by statute law. *Ruth v. Oberbrunner*, as we
have indicated, was decided in 1876. Then the idea first
found lodgment here that the statute on the subject of per-
petuities had abrogated the common law in that regard as to
charities. The argument of Mr. Dixon in that case, as we
have seen, pretty plainly shows that the decision must have
struck the profession as a new departure. What the law was
theretofore supposed to be is most clearly indicated in the
following note of the revisers: *"It shows a defect in the law*
which is generally admitted to require amendment." They
said that the amendment suggested by them would result, if
adopted, in but a moderate innovation. What was the "de-
fect" to which the learned revisers alluded? Plainly, the
"defect," not supposed to exist till the judicial declaration
referred to, that the statute was so framed as to compel the
court to hold that it abrogated the common law as to char-
ities. In other words, independently of the judicial declara-
tion in question, they gave it as their judgment that there
was no "defect" in the statute in that it abrogated the com-
mon law as to charities. That seems to be the irresistible in-
ference from all the circumstances bearing on the question.

In that light the legislature adopted the amendment suggested.

It is' elementary, and statutory as well (sec. 4985, Stats. 1898), that the effect of the amendment above mentioned, and the continuance of the statute otherwise, was merely to leave the law as it was before, with the added feature. Then, we have, in effect, a legislative declaration based on the advice of the distinguished revisers, that, aside from the "defect," so called, the common law respecting charities would not be deemed affected by the statute. That we deem to be of the highest importance in this discussion.

The Revision of 1878 went into effect the 1st day of November of that year. A few months thereafter *Dodge v. Williams*, 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, was argued and decided. It must be presumed that this court was familiar with the amendment to which we have referred, and the judgment of the revisers as well. Upon one phase of the case, as we have seen, the question of whether the statute disturbed the common law as to charities, was vital. *Ruth v. Oberbrunner* was pressed upon the attention of the court as controlling in the matter. The whole subject was discussed and considered, the conclusion reached being that there was no statutory restriction in this state respecting conveyances of property for charitable purposes. All said in *Ruth v. Oberbrunner* inconsistent therewith was expressly discarded as not the law. The law was declared to be in all respects as claimed by Mr. Dixon in his argument in the former case. Thus it would seem, without room for reasonable controversy, the supposed "defect" in the statute, to which the revisers referred, was clearly removed. The letter and spirit of the decision is that no such "defect" existed and that the common law, in its entirety, on the subject of charities, was entirely free from any statutory restrictions in this state. In all that, do we not have the will of the legislature,

inferentially but clearly expressed, the judgment of the dis-
tinguished revisers, and that of this court as well, all in har-
mony with the position I here maintain?

. I concur in the decision of the court as regards what I have
felt justified in characterizing as the accidental features to
which the splendid charity which Mrs. Harris created owes
its safety from destruction, and would add another, which
was urged upon the attention of the court by counsel for re-
spondent. It is this: The city of *Oshkosh* had express legis-
lative authority to take the title to realty by the means the
title to that in question was conveyed to it, and to hold such
title for the purposes for which the conveyance was made.
That, by necessary inference, involved the holding of such
property in perpetuity. If it were true that the effect of the
statute on conveyances for charitable purposes is, as a gen-
eral rule, all that is claimed for it, such express authority,
*pro tanto,* repealed the statute; perhaps the better way to put
it would be, created an exception thereto. That is supported
by reason and by abundance of authority. *Levy v. Levy,* 33
N. Y. 124–130; *Bascom v. Albertson,* 34 N. Y. 598.

I have now expressed my views at great length, but not too
great, I trust, considering the all-important nature of the sub-
ject involved. As indicated at the outset, it was not without
much consideration and hesitation that I reached the con-
clusion respecting my duty to write this opinion. It has been
prepared in no spirit of disputation, though it has taken some-
what of that form, at some points. That seemed unavoidable.
I cannot, however much I may think it is wrong, hope to
change the judicial policy from which I so entirely dissent,
by anything I have said or can say. Nevertheless, I conceive
it to be incumbent upon me to give the reasons which impel
me to dissent from my brethren on an important matter in-
volving the public policy of the state, to the end that if the
law be declared wrongly, I may not be held responsible there-

for, and if the legislature shall see fit to deal with the matter, it can do so with all the light that a comparison of views will throw upon the subject.

It is now, seemingly, up to the legislature, as it was in New York in 1893, to say whether a broad policy as to devises of property to charity shall prevail in this state, or not. It will, in the light of the decision in this case, be unmistakable that if the public desire is that men of wealth shall at least be permitted to have a free hand in devoting their property to the benefit of mankind instead of to mere selfish or private ends, legislative aid or command must be had in the matter. Why should such free hand not be permitted? That is the policy which generally prevails in every section of our country. Why should Wisconsin be an exception? The legislature must answer that. The responsibility for the continuance of the exception rests with that branch of the government, regardless of whether it is responsible for having created it or not. If what I have written shall so emphasize that situation as to stimulate remedial action, placing our state in the front rank of communities as regards favoring devises of privately accumulated wealth to charitable objects, it will be a "consummation devoutly to be wished." Shall we have incorporated into our system the thought, so beautifully expressed: "Charity in thought, speech, and deed, challenges the admiration and affection of mankind. Christianity teaches it as its crowning grace and glory, and the inspired apostle exhausts his powerful eloquence in setting forth its beauty and the nothingness of all things without it." "Though" one "speak with the tongues of men and of angels and have not charity" he is "become as sounding brass or a tinkling cymbal; and though" he "have the gift of prophecy and understand all mysteries and all knowledge, and though" he "have all faith so that" he "could remove mountains and have not charity" he is "nothing." 1 Cor. XIII.

SIEBECKER, J. (*dissenting upon an important question, but concurring in the decision*). I concur in the judgment of this court resulting in affirmance of the judgment of the circuit court in this case. I cannot concur in many of the grounds advanced in the opinion of the court as the basis of the decision. It is my opinion that the statutes of this state prohibiting perpetuities and regulating uses and trusts do not apply to trusts for charitable uses; and, if this case be held to come within such statutes, the authority granted by legislative enactment to the city of *Oshkosh* to maintain a public library is, in effect, a repeal *pro tanto* of such statutes.

I therefore concur in the views expressed in the opinion of Mr. Justice MARSHALL.