WILL OF KAVANAUGH: KAVANAUGH and others, Respondents, vs. WATT, Executor, Appellant.

*April 26—May 24, 1910.*

*Wills: Superstitious uses: Masses: Public charities: Trusts: Certainty: Naming trustee: Equitable conversion: Perpetuities.*

1. The doctrine of superstitious uses under the statute of 1 Edw. VI., c. 14, according to which devises for masses were held void, has never obtained in the United States, where there is absolute religious equality.

Will of Kavanaugh: Kavanaugh v. Watt, 143 Wis. 90.

2. A gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons by bringing their hearts under the influence of education or religion, is a "charity."

3. Masses, as celebrated by the Roman Catholic church, being shown to be public services, not alone for the repose of the souls of deceased persons specifically named, but for the benefit of all mankind, are within the religious or pious uses which are upheld as public charities.

4. A bequest for masses is therefore a "charitable bequest," and valid as such, even though the masses be designated as for the repose of the souls of specified persons.

5. Sec. 2081, Stats. (1898), relating to trusts, does not apply to a charitable bequest, and the question whether such a bequest is sufficiently definite and certain must be determined, not with reference to what is required in regard to private trusts, but with reference to the liberal rules for judicial construction applicable to charitable trusts.

6. A charitable trust is not rendered invalid by indefiniteness as to beneficiaries, if the scheme of charity be sufficiently indicated or a method provided by which it may be ascertained and its objects made sufficiently certain to enable a court to enforce execution of the trust according to the scheme.

7. In charitable bequests no trustee need be named, as a charity will not be allowed to fail for want of a trustee. The person named in the will to execute the charity will be held to be the trustee and, if necessary that he hold the title for the purpose of carrying out the provisions of the will, he will by implication hold such title.

8. A testamentary gift for masses for the repose of the souls of certain persons including the testator, such masses to be "said according to the directions of" two persons named, who are appointed "to direct where and when to say said masses," is sufficiently definite and certain.

9. The fact that property given by will for a public charity consists wholly of real estate, and that no person is named as devisee thereof, does not invalidate the gift, sec. 2075, Stats. (1898), not being controlling in cases of public trusts, where indefiniteness is of the essence of the charity.

10. Where in such a case the terms of the will cannot be carried out without converting the real estate into personalty, equitable conversion results and the estate of the testator is to be treated as personalty.

11. Where, under the doctrine of equitable conversion, the property given by a will for a charity is to be treated as personalty, the

statute of perpetuities need not be considered, even if applicable to charitable bequests.

12. *McHugh v. McCole*, 97 Wis. 166, so far as it conflicts with the decision in this case, overruled.

TIMLIN, J., *dissenting*, is of the opinion (1) that, under sec. 18, art. I, Const., the state cannot, through its courts or legislature, compel, direct, or regulate the celebration of masses, and that where incapacity exists to enforce a charitable trust it is void; and (2) that if in this case there is no equitable conversion of the testator's estate, but the land is to be held in trust indefinitely and the rents and profits devoted to paying for masses, there would result a holding of the use of the land upon a tenure long ago obsolete, as well as forbidden by our state constitution, namely, the tenure of frankalmoign or divine service.

MARSHALL, J., *concurring*, is of the opinion (1) that in view of the full reintrenchment in our jurisprudence of the common-law doctrine of charities, begun in *Dodge v. Williams*, 46 Wis. 70, and completed by the enactment of ch. 511, Laws of 1905, resort to the doctrine of equitable conversion to sustain a devise for charity is no longer necessary; (2) that acceptance of a trust for masses is in the nature of a public contract, to the enforcement of which by the courts, through the attorney general, there can be no constitutional objection based on the right of immunity from interference in religious matters; (3) that secs. 2072, 2073, Stats. (1898), have nothing to do with charitable trusts, where the legal title is always in the trustees and the equitable interest in the beneficiaries; and (4) that the constitutional provision declaring all titles allodial and prohibiting feudal tenures, instead of suggesting incapacity to convey land to charitable uses, rather suggests absolute freedom in that regard.

APPEAL from a judgment of the circuit court for Manitowoc county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

This proceeding was brought in the county court to construe the will of James Kavanaugh, deceased, which is as follows:

"I, James Kavanaugh, of Maple Grove, Wisconsin, being ·of sound mind and memory and understanding but considering the uncertainties of human life, do make and declare this to be my last will and testament.

"First. After the payment of my just debts and funeral ·expenses, I give, devise and bequeath all the rest of my prop-

erty, both real estate and personal property, for masses for the repose of my father's and mother's and sister's and brother's and my own soul. The masses will be said according to the directions of *Thomas J. Fenlon* and *J. P. Watt,* of Maple Grove, Wis., and I hereby appoint them to direct where and when to say said masses. I hereby appoint *J. P. Watt* of Maple Grove, Wis., as executor of this my last will and testament.

"Signed and acknowledged this ninth day of March, 1908.

his

"JAMES X KAVANAUGH.

mark

"Signed and acknowledged by said testator in the presence of us who hereunto subscribe our names in the presence of said testator and of each other.　　JOHN E. MULLENS.

"M. J. KAVANAUGH."

The county court held that the provision in the will which provides that "after the payment of my just debts and funeral expenses, I give, devise and bequeath all the rest of my property, both real estate and personal property, for masses for the repose of my father's and mother's and sister's and brother's and my own soul," is wholly void and of no effect. On appeal the circuit court affirmed the judgment of the county court and entered judgment accordingly, from which this appeal was taken.

*E. L. Kelley* and *P. H. Martin,* for the appellant, cited, among other authorities, *Harrington v. Pier,* 105 Wis. 485; *Flood v. Ryan,* 220 Pa. St. 450, 69 Atl. 908, 22 L. R. A. N. S. 1262; *Hoeffer v. Clogan,* 171 Ill. 462, 40 L. R. A. 730; *Schouler, Petitioner,* 134 Mass. 426; *Rhymer's Appeal,* 93 Pa. St. 142, 39 Am. Rep. 736; *Harrison v. Brophy,* 59 Kan. 1, 40 L. R. A. 721; *Webster v. Sughrow,* 69 N. H. 380, 48 L. R. A. 100; *Moran v. Moran,* 104 Iowa, 216, 39 L. R. A. 204; *Sherman v. Baker,* 20 R. I. 446, 40 L. R. A. 717; *Hadley v. Forsee,* 203 Mo. 418, 14 L. R. A. N. S. 49, 96; *Coleman v. O'Leary's Ex'r,* 24 Ky. Law Rep. 1248, 70 S. W. 1068; *Hood v. Dorer,* 107 Wis. 149; *Kronshage v. Varrell,* 120 Wis. 161; *Dodge v. Williams,* 46 Wis. 70; *Webster v. Morris,* 66 Wis. 366; *Sawtelle v. Witham,* 94 Wis. 412.

For the respondents there was a brief by *Burke & Craite* and *Nash & Nash,* attorneys, and *J. S. Anderson,* of counsel, and oral argument by *R. W. Burke.* Upon the question of the validity of the bequest for masses, they cited *McHugh v. McCole,* 97 Wis. 166, 173; as to equitable conversion, *Eneberg v. Carter,* 98 Mo. 647, 14 Am. St. Rep. 664; *Fahnestock v. Fahnestock,* 152 Pa. St. 56, 34 Am. St. Rep. 623; *Crowley v. Hicks,* 72 Wis. 539; *Prichard v. Thompson,* 95 N. Y. 76; *Read v. Williams,* 125 N. Y. 560; and upon the rule *stare decisis, Pittelkow v. Milwaukee,* 94 Wis. 651; *Brader v. Brader,* 110 Wis. 423.

The following opinion was filed May 24, 1910:

KERWIN, J.    The respondents, heirs at law, attack the will under consideration upon the grounds: (1) That it is void, independent of any statute, for uncertainty and indefiniteness; (2) that it attempts to create a private trust in violation of statute; and (3) that if it attempts to create a public trust it is nevertheless void because under the equity powers of the court it is too indefinite and uncertain to be enforced.    On the part of the appellant it is insisted that the will is simple, the intent plain, and the purpose lawful; that it creates a public charity and as such is valid.    Respondents rely mainly upon *McHugh v. McCole,* 97 Wis. 166, 72 N. W. 631.    Starting with the proposition laid down in *McHugh v. McCole, supra,* that the trust was private and, therefore, too indefinite and uncertain to be enforced by a court of equity, the court easily reached the conclusion that the bequest for masses was void.    No proof was made in the *McHugh Case* that the masses were not private in their nature and for the sole benefit of the souls of the giver and others specifically mentioned.    No evidence was offered as to the nature of masses, whether public or private, and the court rested its opinion upon the idea that the trust was purely private.    Had the court started with the proposition that a

bequest for masses is a public charity, a different conclusion, doubtless, would have been reached in the *McHugh Case*.

Counsel for respondents insist that the bequest violates sec. 2081, Stats. (1898). If, as was assumed in the *McHugh Case*, the trust were private, there would be much force in this contention, since under this section the trust must be fully expressed and clearly defined on the face of the instrument creating it. But this argument is based upon the proposition that the trust created in the case before us is a private trust, not a public charity. So we are brought to the question whether a bequest for masses is a public charity.

Bequests for religious purposes date very far back in judicial history. Some reference is made to them and cases collected in a quaint old book entitled "Law of Charitable Uses, Revised and Much Enlarged; with Many Cases in Law Both Ancient and Modern," printed in 1676 under the censorship of Francis North. At page 35 of this work is found a will dated January 17, 1524, from which we quote some of the "items."

"Item, I Will, after my decease, that A. my wife, have my House called C. during her natural Life, and she to keep up the reparations of said House, and the Lords Rent to pay, and she to find four Tapers of four pounds of Wax; that is, one before the Rude under the Rude Loft, and another before our Lady; another before St. Thomas, and one before St. Anthony.

"Item, I Will, That she keep mine Obit every year during her Life, and to have every year three Priests, and they to have Eight pence a piece, and two dozen of Bread, and a Kinderkin of double Beer, and two Cheeses, price of Twenty pence.

"Item, I Will, and appoint after my decease That all and singular my Evidences, and my Copies, that they be delivered into the custody of the Churchwardens of the Parish of Peter and Paul, of T. aforesaid.

"Item, I Will, That after the natural life of A. my wife, that them my House called C. with all the Appurtenances be-

longing thereunto, as is more plainly specified by my deeds;. that it shall remain evermore unto the Church aforesaid;. First, to keep mine Obit yearly, and the four Tapers of four pounds of Wax. Moreover, I Will, That after the decease of A. my wife, that the Churchwardens do buy six pounds of Wax, and make the common Light, and the Taper before the Rude, to the full of two pounds of Wax apiece, and so to continue for evermore; and the residue of the Rent to remain to the reparations of the Church aforesaid."

Also, on page 41, another will, dated July 1, 1523, by the terms of which there was given "several of her Lands to the use of the Priests Service, in the Church of St. Peter in Stowe-Market, to pray for her Soul, and the Souls of her Husbands and others, for 99 years and the Lands to be sold by her Co-Feoffees, and the one half of the Money to go to the making of the High-way, between Stowe and Ipswich;. and the other to be divided, one part to a Priest, to say Prayers in the said Church of S. Peter, for her Soul, and the Souls of the afore-rehearsed. . . !"

The following authorities also relate to charitable bequests. pertaining to religious purposes: *Baker v. Sutton*, 1 Keen, 224; *Felan v. Russell*, 4 Ir. Eq. 701; *Powerscourt v. Powerscourt*, 1 Molloy, 616; *Moggridge v. Thackwell*, 1 Ves. Jr. 464; *Phillips v. Aldridge*, 4 Term Rep. 264; Tyson, Charitable Bequests, ch. 10, p. 118; *In the Matter of Michael's Trust*, 28 Beav. 39; Tudor, Charities and Mortmain.

There is much conflict in the early and some in the late cases as to what is and what is not a public charity. Many of the bequests in England were held void as being to superstitious uses, but no such rule or principle obtains in this country; hence the decisions declaring gifts or bequests void as gifts to superstitious uses have no application here. *McHugh v. McCole*, 97 Wis. 166, 180, 72 N. W. 631. The doctrine of superstitious uses under the statute of 1 Edw. VI., c. 14, under which devises for masses were held void, has never obtained in the United States, where there is absolute

religious equality.   *Webster v. Sughrow,* 69 N. H. 380, 45
Atl. 139, and cases cited.

Indeed, the question is not new in this state.   In *McHugh*
*v. McCole, supra,* it was held that, had the bequest been di-
rect to a bishop or priest for masses for the repose of the souls
of the persons named in the will, it would have been valid,
but that the contested provisions of the will were void trusts
and not valid personal bequests.   No claim is made by ap-
pellant that the trust is private.   The main questions for
determination, therefore, are whether the bequest for masses
is a public charity and sufficiently definite for enforcement
by a court of equity.   No proof was made in the *McHugh*
*Case* that masses are public in their nature or for the benefit
of mankind generally, and whether the court should have
taken notice of this fact without proof we need not consider
here, because in the case before us such proof was made.   It
was shown by competent evidence that the sacrifice of the
mass is a public service, not alone for the repose of the souls
of the deceased members mentioned, but for the benefit of all
mankind, and so understood by all members of the Catholic
church.   So while the masses may be intended to benefit the
souls of the departed mentioned, the benefits are public as
well, therefore come within the designation of a public
charity.   Masses are religious observances and come within
the religious or pious uses which are upheld as public chari-
ties.   *Schouler, Petitioner,* 134 Mass. 426; *Rhymer's Ap-
peal,* 93 Pa. St. 142; *Hoeffer v. Clogan,* 171 Ill. 462, 49 N.
E. 527; *Webster v. Sughrow,* 69 N. H. 380, 45 Atl. 139;
*Seda v. Huble,* 75 Iowa, 429, 39 N. W. 685; *Sherman v.
Baker,* 20 R. I. 446, 40 Atl. 11.   A gift to be applied consist-
ently with existing laws for the benefit of an indefinite num-
ber of persons by bringing their hearts under the influence of
education or religion is a charity.   *Jackson v. Phillips,* 14
Allen, 539.   In *Hoeffer v. Clogan, supra,* the bequest was of
certain property "to sell the same and expend the proceeds

of said sale in saying masses for the repose of my soul and the souls of my deceased wife, Margaret Clogan, my mother-in-law, Ellen Hurley, and my brother-in-law, James Hurley." The bequest was held valid, and many cases are cited and discussed in the opinion.    The tendency of the courts is to uphold charitable trusts in accordance with the intent of the donor and consistently with rules of law, and this court has asserted the doctrine in no uncertain terms in several cases. The question has been so exhaustively treated in *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, and *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345, that further discussion seems unnecessary.

According to the doctrine of the Catholic church as established by the proof in this case, the whole church profits by every mass, since the prayers of the mass include all of the faithful, living and dead.    The sacrifice of the mass contemplates that all mankind shall participate in its benefits and fruit.

"The mass is the unbloody sacrifice of the cross, and the object for which it is offered up is in the first place, to honor and glorify God; secondly, to thank Him for His favors; third, to ask His blessing; fourth, to propitiate Him for the sins of all mankind.    The individuals who participate in the fruits of this mass are the person or persons for whom the mass is offered, all of those who assist at the mass, the celebrant himself, and for all mankind, within or without the fold of the church."

So it seems clear upon reason and authority, under the doctrine of the Catholic church as established by the evidence in this case, that a bequest for masses is a charitable bequest, and valid as such, although the repose of the souls of particular persons be mentioned.

But it is said that the present bequest is too indefinite and uncertain to be enforceable and is void under the statutes of this state and independent of any statute.    The contention that the will is void for uncertainty independent of any statute

is without foundation under the authorities. The fundamental principle to observe in the construction of wills is to seek out the intention of the testator. This rule has been so often stated by this court that citation of authority is unnecessary. The intention of the testator in this case is plain from the terms of the will, namely, that his property be applied, first, to the payment of his debts, and the residue devoted by *Fenlon* and *Watt* to the celebration of masses. The bequest for masses being, as we have seen, a charitable bequest and for the benefit of mankind in general, the statute relating to trusts (sec. 2081) does not apply. *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103; *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345. It is true, as stated by this court in *Webster v. Morris,* 66 Wis. 366, 28 N. W. 353, and again in *Harrington v. Pier, supra,* that some degree of certainty must be observed in charitable bequests.

"The scheme of charity must be sufficiently indicated, or a method provided whereby it may be ascertained, and its object made sufficiently certain to enable the court to enforce the execution of the trust according to such scheme and for such object. It must be of such a tangible nature that the court can deal with it. The mere direction to expend money for charitable purposes at large is too indefinite to be carried into execution." [66 Wis. 391; 105 Wis. 508.]

The certainty must be determined, not with reference to sec. 2081, Stats. (1898), or that which is required in regard to private trusts, "but with reference to those liberal rules for judicial construction applicable to charitable trusts." *Harrington v. Pier, supra.*

Counsel also contend that, since the estate of the testator consisted principally of real estate, and the will not providing for a disposition of the lands to any one, it is void. But this contention brings us again to the distinction between a private trust and a public or charitable bequest. In the former, statutory certainty is required, while in the latter it is not. The certainty of beneficiaries in cases of private trusts does not

obtain in cases of public trusts. And this is necessarily so from the nature of public trusts as distinguished from private trusts. This subject has been fully covered in *Harrington v. Pier, supra.* At page 514 of 105 Wis. (82 N. W. 355) the court said:

"It follows that indefiniteness of beneficiaries who can invoke judicial authority to enforce the trust, want of a trustee if there be a trust in fact, or indefiniteness in details of the particular purpose declared, the general limits being reasonably ascertainable, or indefiniteness of mode of carrying out the particular purpose, does not militate against the validity of a trust for charitable uses. Given a trust, with or without a trustee, a particular purpose—as education, or relief of the poor, as distinguished from a bequest to charity generally,— and a class great or small, and without regard to location, necessarily, as 'worthy indigent females,' or 'indigent young men studying for the ministry,' or 'resident poor,' or 'indigent children of Rock county,' or 'the boys and girls of California' (*People ex rel. Ellert v. Cogswell,* 113 Cal. 129, 45 Pac. 270), and we have a good trust for charitable uses. The court, through its strictly judicial power, may fill the office of trustee if necessary, the trustee can select the immediate beneficiaries or objects within the designated class and scheme; he can determine upon the details necessary to effect the intention of the donor within the general limits of his declared purpose, and execute the trust accordingly; and the proper public agencies, if necessary, can invoke judicial power to enforce such execution."

Sec. 2075, Stats. (1898), which provides that "Every disposition of lands, whether by deed or devise, hereafter made, except as otherwise provided in these statutes, shall be directly to the person in whom the right to the possession and the profits shall be intended to be vested, and not to any other, to the use of or in trust for such person, and if made to one or more persons in trust for or to the use of another no estate or interest, legal or equitable, shall vest in the trustee," is also relied upon by respondents as rendering the will void. But this statute is not controlling in cases of public trusts where

indefiniteness is of the essence of the charity; nor is it controlling in this case, because the will created an equitable conversion, and the estate of the testator must be treated as personal property. The terms of the will could not be carried out without converting the real estate into personalty. The evidence shows that the estate left amounted to about $6,000, consisting of real and personal property. The real estate was mortgaged for $1,200 or $1,500. The debts allowed by the county court amounted to about $917. The amount of money left was $400, and the personal estate was insufficient to pay the debts. So it is apparent that conversion of the real estate was necessary to carry out the terms of the will. Consequently the doctrine of equitable conversion applies. *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345; *Becker v. Chester,* 115 Wis. 90, 91 N. W. 87, 650; *In re Albiston's Estate,* 117 Wis. 272, 94 N. W. 169; *Holmes v. Walter,* 118 Wis. 409, 422, 95 N. W. 380.

In *Harrington v. Pier,* 105 Wis. 485, at page 492 (82 N. W. 345, 347), quoting from *Given v. Hilton,* 95 U. S. 591, this court said:

"The blending of real estate and personal property in one fund for all the purposes of the will is generally regarded as evidencing intent that the whole estate shall be treated as personal property, even though a necessity therefor does not exist; but such evidence is not conclusive on the question."

It seems clear that the testator intended an equitable conversion. The main question in the case before us, therefore, is whether a bequest for masses is a charitable bequest, and, this being determined in the affirmative, we easily reach the conclusion that the will is valid. In *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, and *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345, it is determined, after an exhaustive review of the authorities, that chancery had jurisdiction over public trusts or charities in England before the statute of 43 Elizabeth, c. 4, and such chancery jurisdiction be-

came a part of our jurisprudence, and, therefore, charitable trusts may be enforced and are not controlled by our statutes of uses and trusts. In the nature of things this was held necessary, because a public trust or charitable use is necessarily indefinite and uncertain, especially as to beneficiaries; that a public trust begins where a private trust ends as regards certainty and definiteness. Of course some degree of certainty must obtain even in a public trust. The scheme of charity must be sufficiently indicated, or a method provided whereby it may be ascertained and its objects made sufficiently certain to enable the court to enforce an execution of the trust according to the scheme. *Webster v. Morris,* 66 Wis. 366, 28 N. W. 353; *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103; *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345. In charitable bequests no trustee need be named, as a charity will not be allowed to fail for want of a trustee. The person named in the will to execute the charity will be held to be the trustee, and, if necessary that he hold the title for the purpose of carrying out the provisions of the will, he will by implication hold such title. *Kemmerer v. Kemmerer,* 233 Ill. 327, 84 N. E. 256; *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345. Since there was equitable conversion in the instant case, the statutes respecting perpetuities need not be considered even if applicable to charitable bequests.

After the decision of this court in *Danforth v. Oshkosh,* 119 Wis. 262, 97 N. W. 258, the legislature passed ch. 511, Laws of 1905, which amends sec. 2039, Stats. (1898), by adding to the exceptions from the operation of that section real estate devised to a charitable use. So that since the passage of this amendment the statute against perpetuities (sec. 2039) does not include devises to a charitable use. However, we need not consider the effect of this amendment. Because of the doctrine of equitable conversion we are only dealing with personal property. In so far as *McHugh v.*

*McCole,* 97 Wis. 166, 72 N. W. 631, conflicts with anything said in this opinion it must be regarded overruled.

It follows that the bequest for masses is valid, and that the judgment of the court below must be reversed.

*By the Court.*—The judgment is reversed, and the cause remanded for further proceedings in accordance with this opinion.

The following opinion was filed May 24, 1910:

TIMLIN, J. (*dissenting*). Eighty acres of presumably agricultural land worth $6,000 mortgaged for $1,500, personal property of a value not disclosed, and $400 in money, subject to unsecured debts of $917, were disposed of by the testator by will in these words:

"After the payment of my just debts and funeral expenses, I give, devise and bequeath all the rest of my property, both real estate and personal property, for masses for the repose of my father's and mother's and sister's and brother's and my own soul.   The masses will be said according to the directions of *Thomas J. Fenlon* and *J. P. Watt* of Maple Grove, Wis., and I hereby appoint them to direct when and where to say said masses.   I hereby appoint *J. P. Watt* of Maple Grove, Wis., as executor of this my last will and testament."

The testator was a member of the Roman Catholic church. It will be noticed that the property is not devised or bequeathed to any designated person nor expressly in trust, nor is there any suggestion on the face of the instrument that the testator himself intended any public benefit.   This last may have been supplied, however, by proof of the fact that he was a Roman Catholic, and that according to the tenets of that faith the celebration of masses, although expressly for the souls of certain designated deceased persons, nevertheless inures to the benefit of all participants in the ceremony and to the benefit of all mankind.   A power, however, is given to two named persons to direct when and where the masses shall

be said.   It is further provided that the masses are to be said according to the direction of these two persons; but this cannot be taken to mean that they are to alter or modify the ceremony, but, as appears from the evidence, merely to designate whether low mass or high mass is to be said, and when and where.    There appears to be a wide discretion vested in these two persons with respect to the exercise of the power.    There are no active duties which require the intervention of a trustee or which might change the disposition of the property from a mere passive use to an active trust, unless we infer from the will a necessity for selling and converting the land into money.    It also appears from the testimony of a priest of this church that the mass is a ceremonial prayer and sacrifice, which must be celebrated by an authorized or ordained priest, but in which any member of the public may participate.    The doctrine of the church is that not only the souls of the departed for which the mass is specially offered, but all present and participating in the ceremonies and, indeed, all mankind, derive spiritual benefit therefrom.    The priest is bound to say the masses within a fixed time (not given) unless the individual ordering and paying for the masses grants unlimited time, and the stipend for a low mass is $1, for a high mass $5 and upward.    The designation of one low mass per year as an obit would continue this trust several thousand years.

I have no doubt that any person in this state by private bequest can devote all or any part of his property to pay for masses by giving it to some designated person competent to take.    I have no doubt that the celebration of masses for the souls of the dead constitutes a "public charity" or a "pious use" within the meaning of these terms at common law; and I have no doubt that the court will not permit a charitable trust to fail for want of a trustee, but will appoint one to carry it out; and I have no doubt that under the statutes of

this state relating to perpetuities charitable uses are exempted from the rules against remoteness.　That statute is as follows:

"The absolute power of alienation shall not be suspended by any limitation or condition whatever for a longer period than during the continuance of two lives in being at the creation of the estate and twenty-one years thereafter, except in the single case mentioned in the next section, and except when real estate is given, granted or devised to a charitable use or to literary or charitable corporations which shall have been organized under the laws of this state, for their sole use and benefit, or to any cemetery corporation, society or association."　Sec. 2039, Stats. (1898), as amended by ch. 511, Laws of 1905.

This is as far as the case was presented by the appellant, and so far I agree with him.　But we have in our state constitution (sec. 18, art. I) as follows:

"The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any ministry, against his consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."

Under this constitutional provision, can this state through its courts or legislature compel, direct, or regulate the celebration of masses?　Could the attorney general on relation of any of the beneficiaries of this trust, or on his own motion, maintain an action to compel or direct the saying of these masses?　I think not.　If he could not, the charitable trust, if one is created, is invalid, because a charitable trust that cannot be enforced is not valid.　2 Perry, Trusts (4th ed.) §§ 708, 711.　This question has usually arisen with reference to such great degree of indefiniteness that it has been

found impossible for the courts to ascertain and enforce the wishes of the testator. But the basic principle is the inability of the state to enforce the trust. Where that inability exists the charitable trust is void. *Heiss v. Murphey,* 40 Wis. 276; *Tilden v. Green,* 130 N. Y. 29, 28 N. E. 880, 27 Am. St. Rep. 487; *Bridges v. Pleasants,* 39 N. C. 26, 44 Am. Dec. 94, 101, and cases in note. The constitution prohibits any control of or interference with the right of conscience. It is manifestly no answer to this to say that there is no likelihood that the masses will be refused nor no likelihood that they will be celebrated outside of this state whereby the people of this state will have no benefit from the charity. The question is: Can the state regulate the saying of masses, and compel, if occasion requires, the saying of such masses in this state? If the state can enforce the saying of masses for the spiritual benefit of non-Catholics, who are, according to the majority opinion, with Catholics the beneficiaries of this charitable trust, the trust is valid; if not, it is invalid. It is quite idle to cite precedents upon this point from the courts of states which have no such constitutional restriction. The decision of the majority of the court in effect decides that the state has such power. This difficulty exists if we take the most favorable view of the devise, namely, that the will requires the real estate to be sold and converted into money and the proceeds of the sale used in paying for masses. If there is no such equitable conversion we run into additional difficulties. If under our statute of uses (secs. 2071 and 2073, Stats. 1898) the title of the trustee to be appointed by the court is merely nominal and is connected with no power of actual disposition or management of the land because there is no requirement of the will that the land be sold and converted into money, then the legal title, by force of these statutes, rests in the beneficiaries. But the beneficiaries must be either the departed souls, the public, *i. e.* the state of Wisconsin, or the priests who receive

the value of the use for saying masses. The souls cannot hold real estate, and the state cannot take title for the purpose of having its people receive this religious instruction under the constitutional prohibition mentioned, so the title must be in the Roman Catholic church, or in the persons who take the rents and profits for their services in celebrating the masses, or in no one. *Sullivan v. Bruhling,* 66 Wis. 472, 29 N. W. 211; *Ruth v. Oberbrunner,* 40 Wis. 238, 258; *Webster v. Morris,* 66 Wis. 366, 28 N. W. 353; *Holmes v. Mead,* 52 N. Y. 332.

If, however, it be contended that the court may change the nature of the charitable trust by not only appointing a trustee, but also by imposing upon him active duties (other than sale and conversion into money), not found in the will, or if it be considered that charitable uses are not executed by the statute, then we have a case where the use of land is held in this state upon a tenure long ago obsolete, also forbidden by our state constitution. If the land is not required to be sold, but may be held in trust indefinitely and the rents and profits devoted to paying for masses for the designated souls and incidentally for all mankind, the legal title must be in the trustee appointed by the court, the beneficial use in the religious association which receives all the rents and profits and says the masses for the public, or in the public. This is a replica of the tenure of frankalmoign or the tenure of divine service. The use of land cannot be held on any such tenure in this state, as I understand the law.

"Tenure in frankalmoign, *in libera eleemosyna,* or free alms, is that whereby a religious corporation, aggregate or sole, holdeth lands of the donor to them and their successors forever. The service which they were bound to render for these lands was not certainly defined; but only in general to pray for the soul of the donor and his heirs, dead or alive; and therefore they did no fealty (which is incident to all other services but this), because this divine service was of a higher and more exalted nature. This is the tenure, by

which almost all the ancient monasteries and religious houses held their lands, and by which the parochial clergy . . . hold them at this day. . . . And, even at present, this is a tenure of a nature very distinct from all others; being not in the least feudal, but merely spiritual. For if the service be neglected, the law gives no remedy by distress or otherwise to the lord of whom the lands are holden; but merely a complaint to the ordinary or visitor to correct it. Wherein it materially differs from what was called tenure by divine service; in which the tenants were obliged to do some special divine services in certain; as to sing so many masses, to distribute such a sum in alms, and the like; which, being expressly defined and prescribed, could with no kind of propriety be called free alms; especially as for this, if unperformed the lord might distrain without any complaint to the visitor. All such donations are indeed now out of use; for, since the statute of Quia Emptores (18 Edw. I.), none but the king can give lands to be holden by this tenure." 1 Cooley's Blackstone, book II, pp. 101, 102, V; *People v. Van Rensselaer,* 9 N. Y. 291, 334–336.

The constitution of this state, like those of New York, Minnesota, and Arkansas, provides (sec. 14, art. I) : "All lands within this state are declared to be allodial, and feudal tenures are prohibited." Allodial is defined by Blackstone as "land possessed by a man in his own right without owing any rent or service to any superior." 2 Blackstone, 105.

"Held in free and absolute ownership, as contradistinguished from feudal tenures, which are prohibited in the same sentence and by the very next words, and the prohibition of which, with their servitudes and reservations, and all the attendant hindrances and obstacles in the way of free and ready sale and transfer of real property, constituted the chief object of the provision." *Barker v. Dayton,* 28 Wis. 367, 384, 385.

I do not think the words "feudal tenure" in the constitution should be given any such strict construction as to permit all tenures of the feudal age which were not according to the distinctions then made strictly feudal. Neither does it

necessarily limit the associated word "allodial;" but the latter word broadens the meaning of the sentence. I think the word· "feudal" relates to the age and the system, rather than to specific tenures among the multiform tenures then in existence. Under such a constitutional provision we surely are not at liberty to revive a species of tenure which the foregoing quotation from Blackstone shows to have been long obsolete even in his day. Conditions, rents, and services may no doubt be exacted as a consideration for a lease, but a grant in fee of the whole land or of the use thereof cannot be upon any such tenure. Some one must own the land as an allodium. The statute Quia Emptores is part of the common law of this state, and that statute by construction long settled does not permit any such tenure as that attempted to be created by this will, if we find no mandatory requirements that the land be sold and converted into money. 1 Reeves, Real Prop. §§ 290, 291; Gray, Perpetuities, §§ 26, 28; *Van Rensselaer v. Hays,* 19 N. Y. 68. There could not be, as I understand this constitutional provision, any rent or service reserved out of a grant or devise in fee, whether such transfer be of the title or merely of the use.

The following opinion was filed June 10, 1910:

MARSHALL, J. (*concurring*). I choose to add a few words to the able opinion for the court by my Brother KERWIN, in order to make more significant that preservation of the public trust intended by the donor does not depend upon the doctrine of equitable conversion, and treat, briefly, some suggested infirmities in the trust, made during our consideration, which might otherwise cause doubt as to the soundness of the court's conclusions.

The full reintrenchment in the jurisprudence of this state of the common-law doctrine of charities was significantly commenced in *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92,

50 N. W. 1103, and though thrown, unfortunately, into some confusion thereafter, was so cleared up, as was supposed, for all time in *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345; *Hood v. Dorer,* 107 Wis. 149, 82 N. W. 546, and *Danforth v. Oshkosh,* 119 Wis. 262, 97 N. W. 258, as to leave no vestige of the supposed application to charities of our statutory restrictions upon conveying property in perpetuity, except as to real estate. In that situation, as suggested in the opinion of the writer, concurred in by my Brother SIEBECKER, in the *Danforth Case,* legislative assistance was necessary to enable the court to rescue our system from the exceptional interference to one conveying his property to charitable uses. It was confidently thought that the people of this state, with a full understanding of such interference, would promptly, through the proper channel, speedily make the public policy of our commonwealth conform to the well-nigh worldwide conception of the importance of promoting the wishes of possessors of privately accumulated wealth to devote the same to the betterment of mankind. At the very first opportunity thereafter ch. 511, Laws of 1905, was passed, exempting real estate from the limitations upon the right to suspend the absolute power of alienation. So now one can freely convey his property in perpetuity, real or personal, in trust for any designated charitable use upon any general scheme to that end. Charity, sweet charity, has thus come into its own. This is deemed to be such a valuable consummation to the people of this state that, in a case like this, the doctrine of equitable conversion, so many times resorted to as a convenient way of avoiding the one supposed infirmity in our system hampering owners of property in their efforts to devote the same to the public good, no longer cuts any figure. In my judgment, if referred to at all, it should be relegated to an insignificant place. Here the donor had an undoubted right to devote his real estate to his chosen charity. True, if there was any doubt about it, in

view of the statute, but there is none, he had an undoubted right to leave his property to be administered as personalty, in respect to which there has never been any interference in our written law with the power to convey in perpetuity.

An idea was advanced that the constitutional right of immunity from interference in religious matters stands in the way of public enforcement of a trust of the character created. The answer to that is that no public enforcement would ever in any event be required, except as to contractual features. The constitution does not exempt religious orders or ministers of the gospel from their obligations of contract. In that field they are amenable to the law of the land the same as individuals in any other field. If one should devise his property to a minister of the gospel or a church society to build a church edifice and the devisee should accept the trust, could such donee be heard successfully to claim immunity from legal coercion to carry out the agreement? That simple proposition, it would seem, shows clearly that if the donee of a trust for masses accepts the offer he thereby makes a promise subject to enforcement like any other promise. He could not for a moment in any court be heard to say, I will not keep my agreement and am entitled to protection in my breach under my constitutional immunity from interference in religious matters. The attorney general in proceeding to enforce such a trust is merely asserting the inviolability of a public contract.

The suggestion that the title to the property, considered as realty, by force of the statutes (secs. 2072 and 2073, Stats. 1898), is in the beneficiaries, since there is no power of disposition. That view overlooks the fact that the statutes have nothing to do with trusts for charity; that in such cases the legal title is always in the trustees and the equitable title in the beneficiaries. Many mistakes have been made by confusing private with charitable trusts, as shown in *Harrington v. Pier, supra.* In the latter, though the trustees have no

duty whatever to perform, except to hold the title and preserve it for the designated public purpose, the nature of the right is strictly legal while the equitable interest is in the beneficiaries which, from the very nature of the trust, must be indefinite.    Any other view would defeat the law of 1905 and perpetuate the very difficulty the legislature intended, by it, to abolish.    I take it that there is no room for fair controversy but that the equitable, not the legal title, is vested in the beneficiaries and the legal title rests in the trustee. That is the logic of *Harrington v. Pier, supra,* and of authorities generally on the subject.    So, notwithstanding the form of the donation is for the repose of souls of the departed, the beneficiaries include the living as well; the great public, and the state, through its law officer, possesses full authority to invoke judicial remedies to prevent any abuse of the trust.

This further reason why a conveyance of realty in trust for perpetual charitable uses is not valid was advanced: that the very constitutional status of titles to real estate precludes. such a trust.    In that reference was made to art. I, sec. 14, of the constitution, declaring that "all lands within this state are declared to be allodial, and feudal tenures are prohibited."    By that, it is suggested, "all hindrances and obstacles in the way of free and ready sale of real property are nugatory."    The logic of that idea would render void all restraints upon the conveyance or use of real estate.    No one would possess authority to hold, convey, or enjoy such property for a limited purpose or period.    That doctrine was advanced in *Barker v. Dayton,* 28 Wis. 367, but rejected as unsound though ingenious.    The argument of counsel who contended for the doctrine which is contrary to the practice under our constitution since its adoption and similar constitutions elsewhere, reasoned from the lexical meaning of the word "allodial" standing alone.    This court rejected counsel's logic, holding that·the use of the term "and feudal ten-

ures are prohibited," following and in close connection with
the term "all lands within this state are declared to be al-
lodial," gave to the whole the meaning that the ownership of
realty is free from those restraints which were characteristic
of the feudal system; that the possessor of the title no longer
is to be regarded as merely holding by the grace of a sov-
ereign lord and subservient to "homage or fealty or military
service," but as holding by right.   Properly understood the
allodial character of title to real estate, instead of suggesting
incapacity to convey the same to charitable uses, rather sug-
gests absolute freedom in that regard.   The contrary idea
advanced during the discussion of this case as inimical to
the validity of the trust in question would, of course, defeat
any trust in real estate whether for a limited period or in
perpetuity.   It would strike the public as passing strange if
they were confronted with a judicial declaration that no man
could hold or transfer any other than an unrestricted title to
real estate characterized by unrestricted right of disposition.
It seems that the idea was most emphatically rejected as un-
sound some forty years ago in *Barker v. Dayton, supra.*   As
there said, in effect, the only meaning of the constitutional
provision is, that titles to realty in this state are free from
any incumbrance in the nature of rent or service or fealty to
a superior, as under the feudal system.